# United States Court of Appeals
## For the Eighth Circuit

_____

## No. 03-2388

_____

|  |  |  |
|---|---|---|
| | * | |
| United States of America, | * | Appeal from the United States |
| | * | District Court for the |
| Plaintiff - Appellee, | * | District of South Dakota |
| | * | |
| v. | * | |
| | * | |
| Cody Cheyenne Medearis, | * | |
| | * | |
| Defendant - Appellant. | * | |
| | * | |

_____

Submitted: May 14, 2004
Filed: September 2, 2004

_____

Before WOLLMAN, HAMILTON[1], and BYE, Circuit Judges.

_____

HAMILTON, Circuit Judge.

Cody Cheyenne Medearis (Medearis) appeals his two convictions for aggravated sexual abuse in Indian Country, 18 U.S.C. §§ 1153, 2241(a), and 2246(2). We affirm.

_____

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

I

A

In considering Medearis' challenge to his aggravated sexual abuse in Indian Country convictions, we recite the facts in the light most favorable to the government, as it prevailed on these counts below. United States v. Reyes, 362 F.3d 536, 539 (8th Cir. 2004) ("[W]e recite and evaluate the facts in the light most favorable to the government because it prevailed at trial.").

In April 1998, Medearis met Sherri Whiting (Whiting) on the Rosebud Reservation in South Dakota. Shortly thereafter, Medearis moved with Whiting to her mother's residence in Florida. In October 1998, Whiting and Medearis left Florida and returned to the Rosebud Reservation, settling in the house of Cheryl Medearis, Medearis' mother.

In the next three plus years, the couple had a tumultuous relationship, separating on several occasions, with the final break occurring on January 3, 2002.[2] On that day, Whiting went, with her children,[3] to her aunt's house, which is located on the Rosebud Reservation, near Mission, South Dakota. In the days that followed, Medearis stopped by a few times to see her, but Whiting did not leave to go anywhere with Medearis.

On Friday, January 11, 2002, Medearis and Whiting agreed to see each other about 7:30 p.m. to talk about their relationship. For some reason not entirely clear

---

[2]The problems between the couple started when Medearis began having relations with other women.

[3]Whiting has two children, one of which, Connor, was borne out of her relationship with Medearis.

from the record, Medearis and Whiting did not meet, and Whiting's efforts to find Medearis that evening were unsuccessful.[4]

The following day, at around 8:00 or 9:00 p.m., Whiting saw Medearis while she was driving around Mission. The two talked briefly, but an argument quickly ensued. The argument apparently ended when the two agreed to meet that night at a mutual friend's house at about 10:00 or 11:00 p.m. to talk about their relationship. Medearis never appeared at the mutual friend's house, so Whiting went to the apartment of her cousin, Fred Whiting, where she had earlier planned to spend the night, arriving there at 1:00 or 1:30 a.m. the next morning (January 13, 2002).

At 2:00 or 2:30 a.m., Whiting heard Medearis arrive in his car in the parking lot in front of Fred Whiting's apartment, as she was familiar with the car's distinctive sound. Medearis did not go to Fred Whiting's apartment; instead, he stayed in the car, revving its motor.

Because Medearis and Fred Whiting had previous altercations, Whiting went outside to talk to Medearis. As Whiting approached the driver's side door, Medearis asked her to get inside so they could talk. Because Medearis had been drinking, as evinced by his slurred speech and red eyes, Whiting refused and headed back to Fred Whiting's apartment.

In response, Medearis got out of the car and ran up behind Whiting, swinging, like he was going to hit her. At that time, Whiting saw a hickey on Medearis' neck. When Whiting asked Medearis if he would let her go into Fred Whiting's apartment to get her coat and shoes, Medearis allowed her to do so. After Whiting entered the apartment, Medearis returned to his car.

---

[4]Medearis was on a date with another woman that night, Rikki Siers (Siers).

Because Whiting wanted to get Medearis to leave without getting Fred Whiting or anyone else involved, Whiting went outside to talk to Medearis. Whiting approached the driver's side of the car to talk. The talking turned to arguing, and when it began to snow and drizzle, Whiting entered the car through the passenger side, keeping the door open a crack.

Almost immediately, Medearis started calling Whiting a "slut" and a "bitch." In response, Whiting asked Medearis, rhetorically, why he was coming to see her to work things out when he had a hickey on his neck from somebody else. Medearis denied he had a hickey and Whiting, at this point, told Medearis that she did not want to argue when he had been drinking and suggested that they talk another time. In response, Medearis asked Whiting to continue the conversation, but instructed her to get out of the car.

When Whiting tried to get out of the car, Medearis grabbed her by the back of her hair and yanked her back into the car. Whiting started to scream for Fred Whiting.[5] Medearis shut the passenger door, slamming Whiting's leg in the door. As Medearis pulled the car out of the parking lot, Whiting tried to jump out, but Medearis grabbed her again, this time putting her in a "headlock" on his lap. Whiting then bit Medearis on the thumb, which allowed her to lunge for the door again. However, Medearis sped away, which prevented Whiting from leaving the car.[6]

Medearis stopped the car on Hidden Timber Road, where the two had a chance to talk, with Medearis indicating he wanted to reconcile and Whiting commenting that she did not because she "couldn't handle the fighting anymore." At one point,

---

[5]These screams were not only heard by Fred Whiting but also by a neighbor of Fred Whiting's, Donald Bear Robe.

[6]Donald Bear Robe did not call the police because he believed what transpired was a "common fight going on amongst couples."

Medearis unloaded his gun, telling Whiting, "don't worry, I'm not going to shoot you."

As the two talked, a truck went by, turned around, and slowly approached Medearis' car. Medearis jumped out of the car to speak to the truck driver, who apparently was known to Medearis.

Medearis returned to the car and told Whiting to take the car. Medearis then got out of the car. After he punched a passenger-side window, he reentered the car, telling Whiting to "get the f*** out of here." Medearis opened the passenger door and pushed Whiting out.

As Whiting walked behind the car, Medearis backed the car up. Medearis then slammed on the brakes, got out of the car, and demanded that Whiting get her "f***ing ass in the car" or he was going to "beat the f*** out of" her. When Whiting started backing away from him, Medearis ran toward her and pushed her onto the highway, telling her to "get the f*** out of here, run." Whiting started to run away, but Medearis caught her and pushed her into a ditch. When Whiting tried to get up, Medearis grabbed her by her jacket, lifted her off the ground, and told her to get in the car, pushing her back across the highway. Medearis opened the passenger door and "put" Whiting back in the car. Once in the car, Medearis blamed Whiting, saying, "see what you made me do?"

Whiting pleaded with Medearis to take her back to her van, which was located at Fred Whiting's apartment. Medearis angrily accused Whiting of being with other men and demanded to know who they were. Medearis told Whiting that he might as well rape her, "do" her one last time, and that he should just "butt f***" her. As Whiting pleaded for him not to do that, Medearis reached over and threw her seat back.

Medearis then started to drive toward his mother's house. On the way, Whiting indicated that she did not want to go there because her kids were there. Nevertheless, Medearis continued toward his mother's house, stopping the car near the driveway to the house. At that point, Medearis threatened Whiting that he would run her over if she got out of the car. Medearis then switched gears somewhat, telling Whiting that if she could "make it through that ditch, across that fence, before [he got] to [her] then [she would] be all right." When Whiting opened the door to get out and make a run for it, Medearis slammed the car into reverse, backing the car up while at the same time taunting Whiting to "jump" out of the car. Medearis then stopped the car and told Whiting he was going to rape her. Thereafter, he starting driving the car again, telling Whiting at this time to remove her pants.

Medearis stopped the car on a trail, just off of Wood Road. Medearis then started to pull Whiting's pants down. He locked all of the car doors, crawled over to the passenger seat, unfastened his own pants, and got behind Whiting. Whiting continued to plead for him to stop, but Medearis responded by saying, "all I want to do is to make love to you."

Medearis pulled Whiting's jacket off over her head and sucked her breasts, while Whiting screamed "no." Medearis then got on top of Whiting, spread her legs, forcing one of her legs up. Medearis performed oral sex on Whiting, while she tried to push him away. Medearis came back up, forced Whiting's hands behind her head, and then drove his penis into Whiting's vagina, saying he "always wanted to do this." Medearis then removed his penis from her vagina and inserted his fingers inside of her vagina, while Whiting continued to scream. After removing his fingers, Medearis inserted his penis again and quickly pulled it out, commenting that he could not "f***" her. Medearis then smeared his fingers across Whiting's face, sneering, "[t]his is how you f***ing smell." Medearis returned to the driver's seat and told Whiting to "get the f*** out." Whiting then exited the car and walked to Medearis' mother's house. Once there, Cheryl Medearis' boyfriend took Whiting to her aunt's house.

Upon her arrival at her aunt's house, Whiting was crying and her hair was "all messed up." Whiting was cold, and when her aunt tried to zip up her coat, there was no zipper.[7]

Whiting's aunt took Whiting to the Indian Health Service Hospital in Rosebud, where she was seen by Dr. Zijad Sabovic (Dr. Sabovic) at 6:10 a.m. During his examination, Dr. Sabovic observed that Whiting had fresh bruises on both of her knees, on her left elbow, and on her left shoulder. In addition to observing redness on Whiting's left thigh, Dr. Sabovic also observed an excoriation of the vaginal vault. At trial, Dr. Sabovic opined that Whiting's injuries were consistent with forced sexual intercourse.

At the hospital, a rape kit was administered, which included both an oral and vaginal swab of Whiting. Medearis was found to be the source of the DNA discovered on the vaginal swab. Moreover, as part of the preparation of the rape kit, Whiting was asked to remove her clothing while standing on a white piece of paper so that Dr. Sabovic could collect her clothing, including her panties, and any foreign material dislodged from her clothing during this process. After Whiting removed her clothing, Dr. Sabovic recovered gravel and sand, which he opined came from either Whiting's panties, her other clothing, or her feet.[8]

B

In March 2002, Medearis was charged, as an Indian, with one count of kidnapping (Count One) in Indian Country, 18 U.S.C. §§ 1153 and 1201, and two

---

[7]Part of the zipper was discovered in Medearis' car following the incident in question.

[8]At the hospital, Whiting gave three detailed and thorough accounts of the incident, one to the hospital staff, one to Sergeant Esther Murray, and one to a criminal investigator, Grace Her Many Horses.

counts of aggravated sexual abuse in Indian Country (Counts Three and Five), 18 U.S.C. §§ 1153, 2241(a), and 2246(2), by a federal grand jury sitting in the District of South Dakota. In alternative counts, Medearis was charged, as a non-Indian, with kidnapping (Count Two) in Indian Country, 18 U.S.C. §§ 1152 and 1201, and two counts of aggravated sexual abuse in Indian Country (Counts Four and Six), 18 U.S.C. §§ 1152, 2241(a), and 2246(2). Pursuant to a stipulation between the parties, Medearis acknowledged that he was an Indian person and, as a result, Counts Two, Four, and Six were dismissed.[9]

Following a bond hearing, Medearis was released on certain conditions, including that he submit to and pass urine analyses and that he attend all hearings related to this matter. After failing two urine tests and failing to attend a hearing, Medearis fled, but later surrendered on his own volition in August 2002, after several months on the run.[10]

---

[9]Native American tribes generally have exclusive jurisdiction over crimes committed by Indians against Indians in Indian Country. However, two federal statutes provide for federal jurisdiction over such crimes. The first statute, 18 U.S.C. § 1152, known as the "General Crimes Act" (GCA), mandates that the "general laws" of the United States, which are applicable in federal enclaves such as military bases, apply in Indian Country. However, there are two important limitations on the scope of the GCA: it does not extend to offenses committed by an Indian against another Indian or any Indian who has been punished for that act by the local law of the tribe. The second statute, 18 U.S.C. § 1153, known as the "Major Crimes Act," partially abrogated the GCA by creating federal jurisdiction over fourteen enumerated crimes committed by Indians against Indians or any other person in Indian Country, including kidnapping and felonies listed in the Sexual Abuse Chapter (109A) of Title 18.

[10]Around this time, Medearis was using marijuana and methamphetamine. He testified that he began using drugs after he met Whiting.

At trial, Whiting testified to the events described above. Her credibility was painstakingly and exhaustively attacked by Medearis' counsel on cross-examination. Counsel for Medearis was able to demonstrate that Whiting gave inconsistent statements over time. Counsel was also able to establish that Whiting generally feared losing Medearis and he was able to explore any ill motives Whiting may have had concerning her desire to seek revenge against Medearis for his having relations with other women.

For his part, Medearis testified that, after he arrived at Fred Whiting's apartment, Whiting willingly got into his car. Medearis testified that they drove for a while and then stopped just off of Wood Road. According to Medearis, after consensual sex, Whiting noticed a hickey on his neck that Siers had given him.[11] Whiting then became irate and threatened that he would never see his son again. He then drove to his mother's house. Before she got out of the car, Whiting broke the zipper on her coat, trying to zip the zipper.[12] Medearis testified that Whiting got out of the car and fell, landing on her knees. She then got up and walked toward Cheryl Medearis' house. At that point, Medearis decided to leave. He was later interviewed by Grace Her Many Horses. During the interview, Medearis asked Grace Her Many Horses if Whiting was "all right." As to Whiting's injuries, Medearis testified that at least some of them were caused by having sex in a small car.

---

[11]Siers resided at Fred Whiting's apartment from October 2001 until January 2002. On January 10 and 11, 2002, she went out on dates with Medearis and had sex with him on both occasions in his car. According to Siers, having sex in such close quarters caused her to bruise. Siers testified that she saw Whiting enter Medearis' car while it was stopped outside Fred Whiting's apartment on January 13, 2002. At that time, she heard no screams.

[12]Medearis also testified that on another occasion Siers broke her zipper in his car.

In his closing argument, the Assistant United States Attorney (AUSA) argued that the evidence supported guilty verdicts, based primarily on Whiting's testimony, as supported by the government's other witnesses (mainly Dr. Sabovic), and the physical evidence. The AUSA also pointed out that Medearis' flight was consistent with guilt as opposed to innocence.

In his closing argument to the jury, counsel for Medearis explained to the jury that this case involved false accusations fueled by either jealousy, anger, or revenge. In making this argument, he continuously attacked Whiting's credibility as a witness. For example, Whiting testified on direct examination that, at one point when Medearis' car was parked on Hidden Timber Road, Medearis got out and punched the passenger window. Counsel pointed out that this testimony was inconsistent with her statement to Grace Her Many Horses on the morning of the rape that a driver-side window was punched. Counsel also pointed out that, while Whiting testified on direct examination that she was pushed out of the car while it was parked on Hidden Timber Road and then thrown into a ditch, she told Cheryl Medearis that she was dragged out of the car by her hair and then thrown into the ditch. Counsel pointed out that, while Whiting testified on direct examination that she was scared that Medearis was going to run her over, in an earlier statement to the FBI, she said that Medearis had tried to run her over. Whiting also testified on direct examination that the driver of the truck stopped by before they initially went near Cheryl Medearis' house; however, counsel pointed out that, when she talked to Grace Her Many Horses, Whiting indicated that the truck driver stopped by right before she claimed she was raped. Counsel also told the jury that, while Whiting claimed she never threatened Medearis with the loss of his son, Cheryl Medearis testified that Whiting told her on the morning of January 13, 2002 that Medearis "was never going to see his son again," that he "was going to pay," and that she was going to put him "in jail."[13]

---

[13]Cheryl Medearis testified that, on the morning of January 13, 2002, Whiting's hair was "pretty" and that she "appeared fine." Cheryl Medearis did acknowledge

Counsel also pointed out that Whiting gave inconsistent accounts concerning her pants. On direct examination, Whiting testified that Medearis only took one of her pants legs off; yet, in some earlier statements to law enforcement, she said her pants were taken off completely. Counsel also established that Whiting gave differing accounts on whether she was hit on the night in question.

Counsel for Medearis also made several points concerning the physical evidence. He noted that Whiting claimed she had bitten Medearis' thumb, but that Grace Her Many Horses indicated in her report that she saw nothing after she examined Medearis' thumb. Counsel also pointed out that Whiting had no scrapes or bruises on her hands even though she testified that, while she was running, Medearis came up behind her at a run and pushed her down. Counsel also argued that, although Whiting claimed that she was thrown down in the ditch and flipped over onto her back, she had no mud or grass stains on her jacket.

Counsel for Medearis also made some additional points suggesting that the evidence in the record was inconsistent with rape. First, he posited that, if Whiting feared she was going to be raped, she would have locked the doors and driven off in the car after Medearis exited the car while it was parked on Hidden Timber Road. Moreover, counsel pointed out that Whiting made no effort to alert the truck driver who stopped and spoke to Medearis. Counsel also pointed out that the emergency room nurse indicated in the hospital report that Whiting stated that Medearis was "being nice when taking my clothes off." Counsel also pointed out that Whiting did not want to go to the police or the hospital right away; instead she asked Cheryl Medearis' boyfriend to drive her to her aunt's house. Finally, counsel pointed out

_____

that she had earlier testified before the grand jury that Whiting was "emotionally upset" and "crying" that morning. Cheryl Medearis' boyfriend gave similar testimony. He testified at trial that Whiting's clothing and hair appeared "neat," but he, too, acknowledged that he testified before the grand jury that Whiting was "crying" on the morning of the incident in question.

that Whiting went to Medearis' motel room to wait for him a couple of weeks after the incident in question.

In his rebuttal, the AUSA argued that Whiting was a more credible witness than Medearis, who fled prior to trial. He also reemphasized that Whiting's testimony was consistent with Dr. Sabovic's testimony and the physical evidence.

At the conclusion of the trial, the jury convicted Medearis of the two remaining aggravated sexual abuse counts, but acquitted him of the remaining kidnapping count. The district court sentenced Medearis to 108 months' imprisonment, and Medearis noted a timely appeal.

II

Medearis' principal argument on appeal is that the district court erred when it refused to allow his counsel to use a letter allegedly written by Whiting to impeach her testimony at trial. In making this argument, Medearis goes on to posit that the district court's refusal to allow his counsel to use the letter for impeachment purposes was not harmless error.

A district court's evidentiary rulings are reviewed by this court under the abuse of discretion standard. United States v. Buffalo, 358 F.3d 519, 521 (8th Cir. 2004).

During Whiting's cross-examination, counsel for Medearis began to explore Whiting's fear of losing Medearis. He asked Whiting if "at some point" she "wrote him a letter" about her fear of losing him.[14] The AUSA objected to counsel for

_____

[14]The letter reads as follows:

Cody, hi baby!

I just wanted to write a few lines to let you know that I do really <u>love</u> you a lot

- 12 -

and I don't want to loose [sic] you, even though I do know that <u>if</u> I do ever loose [sic] you it'll be my fault because of the way I act sometimes but I can honestly say that I would rather loose [sic] you because of the problems I have dealing with the way I am than loosing [sic] you to another girl. That's what I guess I fear the most. I hate the fact that I feel the way I do. I just don't want to have the first feeling of a chance of loosing [sic] you, that probaly [sic] sounds crazy but that's the only way I could explain it.

I just <u>love</u> you so much Cody. I haven't felt this strong about anybody in a long time. I can talk to you about anything even though sometimes I'm scared to. I feel so comfortable with you and I can be myself.

I know I can act so negative about things, I'm sorry, I shouldn't ever do that because I know deep down that I <u>Love</u> you and want to be with only you and I do believe that you <u>love</u> me and want to be with only me because of the [sic] how much you tell me.

I'm so sorry I doubt you so much and I hope you'll give me a chance. I don't know why I feel so ensecure [sic]. It seems like the only time I have been this way's [sic] when I'm with someone but when I'm single there's no such thing. Weird heh [sic]?

Well I've probaly [sic] bored you enuff [sic]. Just wanted you to know that I do <u>love</u> you and I don't ever want to loose [sic] you. I want us to have a life together and I promise I'm going to deal with my ensecure [sic] problem because the last thing I want to do is loose [sic] you Cody.

This whole letter is pretty stupid and I'm sorry for that too.

Well just to let you know again I <u>love</u> you baby and everything about you! Forever!

Love<br>Sherri W.

P.S. one more thing
I'd really like it

Medearis' line of questioning and his reference to the letter because the letter was not provided during discovery. Upon inquiry from the district court, Medearis' counsel expressed his belief that the letter had been sent to the AUSA, but apparently not received. Counsel for Medearis informed the court that the letter was being used only for impeachment purposes. The court prohibited Medearis' counsel from using the letter because it was not previously disclosed to the government, ostensibly under Rule 16(b)(1)(A) of the Federal Rules of Criminal Procedure, the only rule that "speaks to materials such as handwritten notes in a defendant's possession." United States v. Moore, 208 F.3d 577, 578 (7th Cir. 2000).

For good reason, at oral argument, the government essentially conceded that the letter was admissible for impeachment purposes. Rule 16(b)(1)(A) states in pertinent part:

> If a defendant requests disclosure . . . and the government complies, then the defendant must permit the government, upon request, to inspect and to copy or photograph . . . papers, [and] documents . . . if:
>
>> (i) the item is within the defendant's possession, custody, or control; and
>>
>> (ii) the defendant intends to use the item in the defendant's case-in-chief at trial.

Fed. R. Crim. P. 16(b)(1)(A)(i), (ii). "[E]vidence in chief" is defined in the Advisory Committee Notes to the 1974 Amendments to Rule 16(b)(1)(A) as "any documents . . . which he intends to introduce in evidence in his case in chief." Thus, the

---

if you would open up
more to me too.

I
Love
You!

requirement of reciprocal pre-trial disclosure under Rule 16(b)(1)(A) includes only documents which the defendant intends to introduce during his own case-in-chief. Because Medearis received his requested discovery from the government, he had to furnish in exchange tangible evidence which he intended to introduce as evidence in his case-in-chief. Yet, Medearis did not seek to use the letter in his case-in-chief. He tried to use it for impeachment purposes. Because counsel for Medearis was attempting to use the letter to impeach Whiting's testimony, it was not excludable under Rule 16(b)(1)(A).

In Moore, during the cross-examination of a prosecution witness, defense counsel attempted to use a handwritten note signed by the witness for impeachment purposes. 208 F.3d at 578. As in this case, the district court excluded the use of the note because a copy had not been provided pre-trial to the government. Id. In finding that the district court erred, the Moore court noted that, under Rule 16(b)(1)(A), only evidence the defendant "intends to introduce as evidence in chief at the trial" is required to be disclosed. 208 F.3d at 579 (internal quotation marks omitted). The court noted that the defendant did not seek to use the note "as evidence in chief at the trial," but only "as a prior inconsistent statement by [the witness] that would undermine his credibility in the jurors' eyes." Id. (internal quotation marks omitted). Because the defendant sought "to use the note to impeach the testimony of a witness for the prosecution; it was not properly excludable under Rule 16." 208 F.3d at 579.

Based on the foregoing, we conclude that the district court abused its discretion when it refused to allow Medearis' counsel to use the letter to impeach Whiting's testimony. The only remaining question is that of harmless error. Under the harmless error standard, we will reverse only when the "improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict." United States v. Ballew, 40 F.3d 936, 941 (8th Cir. 1994).

Initially, we note that, because the district court erroneously held that Medearis' counsel could not use the letter on account of a discovery violation, the court never addressed issues concerning the authenticity of the letter. Indeed, there were no findings concerning: (1) whether Whiting wrote the letter; or (2) when the letter was written. However, in conducting our harmless error analysis, we will assume that the letter was written by Whiting either shortly before or shortly after the incident in question.

Medearis posits that the letter was essential for proper impeachment of Whiting's testimony. First, he suggests that he could have used the letter to show that Whiting lied on direct examination when, in response to the question of whether the thing she feared "the most" was losing Medearis to another woman, she said that was "not what I feared the most." In the letter, Whiting wrote that losing Medearis to another woman was what she "fear[ed] the most."

Although Whiting's testimony is inconsistent with her statement in the letter, this additional impeachment evidence would have been of little value. Counsel for Medearis was able to demonstrate, in painstaking detail, that Whiting gave several minor inconsistent statements over time. This additional inconsistent statement was really of no consequence, especially considering that counsel for Medearis was able to: (1) establish that Whiting generally feared losing Medearis; and (2) explore any ill motives Whiting may have had concerning her desire to seek revenge against Medearis for his having relations with other women. On cross-examination, Whiting acknowledged that her problems with Medearis started when he started seeing other women. Whiting also admitted that she did not want to lose Medearis to another woman, and that his relations with other women upset her, especially when he was seeing one of her best friends. She also acknowledged that she wanted things to work because they had a child together. All of this evidence suggests that Whiting did not want to lose Medearis and, in fact, feared losing him, thus providing more than

adequate fuel for Medearis' argument that Whiting fabricated her testimony out of jealousy or to seek revenge against Medearis for seeing other women.

Medearis also posits that Whiting's statements in the letter concerning how much she loved Medearis, how comfortable she felt around him, and how it would be her fault if their relationship failed, would have assisted him in further impeaching Whiting's testimony to the point where his substantial rights are now affected. We disagree. Testimony at trial established that Whiting did care for Medearis, that she wanted things to work out with Medearis, that her demeanor caused ups and downs in her relationship with Medearis, and that she felt comfortable to meet with him to discuss their relationship.[15] This evidence essentially provided him with the same impeachment evidence he claims he lacked.

In our view, the case was not especially close on the aggravated sexual assault counts. Whiting was taken against her will to a trail off of Wood Road. Whiting's testimony in this regard is corroborated by Donald Bear Robe who heard Whiting's screams while Medearis drove off from the parking lot of Fred Whiting's apartment. Upon arrival at the trail, Medearis started to pull Whiting's pants down as she pleaded for him to stop. Eventually, Medearis forced Whiting's hands behind her head as he drove his penis into her vagina, telling her he "always wanted to do this." Medearis then removed his penis from her vagina and inserted his fingers inside of her vagina, while Whiting continued to scream. After removing his fingers, Medearis inserted his penis again and quickly pulled it out, commenting that he could not "f***" her.

Whiting's version of the forcible nature of the encounter is supported by the testimony of Dr. Sabovic and the physical evidence. In addition to observing redness

_____

[15]Interestingly, Medearis' counsel never once asked Whiting if she loved Medearis at anytime before or after the alleged incident. In fact, the record is devoid of any evidence tending to show that Whiting did not love Medearis. After all, he was the father of her child.

on Whiting's left thigh and an excoriation of the vaginal vault, Dr. Sabovic observed that she had fresh bruises on both of her knees, on her left elbow, and on her left shoulder. Dr. Sabovic opined that Whiting's injuries were consistent with forced sexual intercourse. Dr. Sabovic also recovered gravel and sand, which he opined came from either Whiting's panties, her other clothing, or her feet.

At the hospital, a rape kit was administered, which included an oral and vaginal swab of Whiting. Medearis was found to be the source of the DNA discovered on the vaginal swab. Moreover, at the hospital, Whiting gave three detailed and thorough accounts of the incident, one to the hospital staff, one to Sergeant Esther Murray, and one to a criminal investigator. While a few of the minor details of these reports are inconsistent with Whiting's trial testimony, the crucial details concerning where, when, and how the rape occurred are consistent.

Counsel for Medearis did his best to show that Whiting's testimony involved false accusations fueled by either jealousy, anger, or revenge. However, his argument simply did not carry the day given the physical evidence supporting Whiting's allegations of aggravated sexual abuse. Moreover, counsel for Medearis faced an uphill climb given the fact that Medearis fled for a period of time, used drugs, was sleeping with other women ostensibly when he was trying to reconcile with Whiting, engaged, at times, in violent conduct, and asked Grace Her Many Horses how Whiting was doing several hours after the incident. More importantly, Medearis' version of the encounter on Wood Road was suspect to say the least, that Whiting's extensive bruises were the result of rough sex in the car, that she lost her zipper while trying to put on her jacket (the second person in less than three days to have that happen in the same car), and that she fell while trying to get out of the car causing her clothes to accumulate both stains and gravel.

Our dissenting colleague takes the position that the letter, assuming it was written after the incident in question, would have influenced the outcome of the trial.

For several reasons, we respectfully disagree. First, the timing of the letter would neither have altered Whiting's trial testimony nor undermined the three detailed and thorough accounts Whiting gave at the hospital. Second, the timing of the letter would not have undermined the testimony of Dr. Sabovic and the physical evidence evincing rape. Finally, the timing of the letter would have done little to aid the uphill climb faced by Medearis. His pre- and post-incident conduct was profoundly inculpatory and his version of the incident in question was highly suspect.

In short, the use of the letter would not have influenced or altered the outcome of the trial, regardless of when it was written. For this reason, we conclude that the district court's refusal to allow counsel for Medearis to use the letter allegedly written by Whiting is harmless error.

III

Medearis also contends that there is insufficient evidence in the record to support his two convictions for aggravated sexual abuse.

When reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the government and accept all reasonable inferences which tend to support the jury's verdict. United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003). While the evidence need not preclude every outcome other than guilty, we consider whether it would be sufficient to convince a reasonable jury beyond a reasonable doubt. United States v. Roach, 28 F.3d 729, 736 (8th Cir. 1994). This court will reverse for insufficient evidence only if no reasonable jury could have found Medearis guilty beyond a reasonable doubt. United States v. Henderson-Durand, 985 F.2d 970, 975 (8th Cir. 1993).

To convict Medearis of aggravated sexual abuse, the government had to prove beyond a reasonable doubt that: (1) Medearis is an Indian; (2) Medearis caused Whiting to engage in a sexual act; (3) Medearis used force or the threat of force to

cause Whiting to engage in a sexual act; and (4) the events occurred on Indian land. United States v. Eagle, 133 F.3d 608, 610 (8th Cir. 1998). Only the second and third elements are in dispute.[16]

We believe the evidence is more than sufficient on the second and third elements. The evidence described in the preceding section of this opinion amply supports the jury's conclusion that Medearis used force or the threat of force to cause Whiting to engage in two sexual acts.[17]

---

[16]The evidence in the record is undisputed concerning the first and fourth elements. Medearis stipulated that he has some degree of Indian blood and therefore is recognized as an Indian. Moreover, Harold Compton, Realty Officer with the Bureau of Indian Affairs for the Rosebud Agency, testified that the location at which the alleged aggravated sexual abuse occurred was on the Rosebud Reservation and therefore was considered Indian Country.

[17]Medearis also suggests that the jury's not guilty verdict on the kidnapping count is unconstitutionally irreconcilable with the jury's guilty verdicts on the aggravated sexual abuse counts. Because the elements of the kidnapping count are different from the elements of the aggravated sexual abuse counts, the result is not necessarily inconsistent. Even if it were, this court has rejected this line of argument. See, e.g., United States v. Whatley, 133 F.3d 601, 606 (8th Cir. 1998) ("The only relevant question when reconciling inconsistent verdicts . . . is whether there was enough evidence presented to support the conviction. . . . Inconsistent verdicts are not, on their own, sufficient grounds for reversal or a new trial.").

IV

For the reasons stated herein, the judgment of the district court is affirmed.[18]


BYE, Circuit Judge, dissenting.


With due respect, I dissent from that part of the court's judgment concluding Mr. Medearis was not substantially prejudiced by the district court's refusal to admit the letter to impeach Ms. Whiting's testimony on cross examination.


The majority takes an all-too-myopic view of the impeachment process. True, the letter would have been cumulative to the extent it impeached certain details of Ms. Whiting's testimony, such as her fear of losing Mr. Medearis to another woman. But, if written after the assault, the letter's competence to impeach such testimony is dwarfed by its power to undermine Ms. Whiting's ultimate statements – that she was taken against her will from her cousin's home, physically and psychologically abused, and then forcibly raped by Mr. Medearis. Well versed in the subtleties of the rules of evidence, we may be able to so isolate each statement in the letter as to minimize the letter's overall power to impeach. But I cannot believe a jury of Mr. Medearis's peers, taking a common-sense view of the matter, would not have wondered how Ms. Whiting, in so effusive a letter, could have vowed her lasting love for, and expressed

_____

[18]Following his convictions, Medearis filed a motion for new trial based on newly discovered evidence, which the district court denied. In a one-paragraph argument on appeal, Medearis claims this was error. We have reviewed Medearis' argument and our analysis of the controlling factors establishes that his argument is without merit. See United States v. Duke, 255 F.3d 656, 659 (8th Cir. 2001) (holding that to justify a new trial based upon newly discovered evidence, "(1) the evidence must have been discovered after trial; (2) the failure to discover this evidence must not be attributable to a lack of due diligence on the part of the movant; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be likely to produce an acquittal if a new trial is granted").

her dread of losing, the man she had recently accused of sexual assault against her person.

Because I cannot say the jury would have been unaffected by such impeachment evidence, I must conclude the district court's error worked substantial prejudice upon the defense and therefore was not harmless. Accordingly, I respectfully dissent.

———————