# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1820

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Nebraska. |
| Ken R. Fleck, | * | |
| | * | |
| Appellant. | * | |

_____

Nos. 04-1928/04-1929

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee-Cross Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Robert G. Fleck, Jr., | * | |
| | * | |
| Appellant-Cross Appellee. | * | |

_____

Submitted: November 18, 2004
Filed: June 29, 2005

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

BEAM, Circuit Judge.

Ken and Robert Fleck were each convicted following a jury trial of one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Both Ken and Robert Fleck appeal (1) the district court's decision to allow trial testimony regarding another alleged crime, (2) the district court's application of the sentencing guidelines to find that they possessed nine firearms, and (3) their resulting sentences based on the constitutionality of the sentencing guidelines. In addition, Ken appeals the district court's finding that he committed the instant offense less than two years after being released from prison, and Robert appeals the district court's denial of his motion to suppress. The government cross-appeals the district court's finding that Robert's prior conviction for a commercial burglary did not constitute a crime of violence under United States Sentencing Guidelines (U.S.S.G.) § 4B1.2(a). After review, we affirm the Flecks' convictions, but remand both of their cases for resentencing.

I.     BACKGROUND

On November 7, 2002, at around 4:30 p.m., Officers Kuiken and Sinnott of the Omaha Police Department responded to a disturbance involving personal property at a house owned by Robert and Ken Fleck, and their sister, in Omaha, Nebraska. Eldon Byers told police that he believed his property–items that had been stolen from him a year earlier–was at the Flecks' residence.[1] When the officers arrived at the house, Ken or Robert answered the door. The officers explained they had a report

---

[1]Byers was living in the Flecks' house as a tenant at the time his property was stolen. It was assumed to be a burglary, and the Flecks offered to make a claim on their homeowners insurance. After Byers moved out, another tenant started noticing Byers' property re-appear throughout the house. Suspicious, she contacted both the insurance company and Omaha police about possible insurance fraud on the part of the Flecks. She also contacted Byers, who called the police himself, prompting their trip to the Fleck home.

that stolen property was in the home and asked if they might look around. The officers were invited in by Ken or Robert. The Flecks, their sister, and two other people were in the house. Once inside, the officers looked only in the vicinity of the living room and dining room but stopped once they saw what could have been some of Byers' property in the dining room. They planned to obtain permission for a full-house search or to get a warrant. They left the house briefly to await the arrival of burglary detectives Cardenas and Perna, who were en route. The detectives arrived some twenty to thirty minutes later. Before departing for the house, Detective Perna had checked police records and had discovered that both Flecks had previously been convicted of felonies. When the detectives arrived, they told Officer Kuiken about the Flecks' prior felony convictions. Officer Kuiken and the detectives re-entered the house. Around the same time, two more officers arrived at the scene. One of those officers stayed in the cruiser, and the other spoke with Sinnott on the front porch.

Once inside, Detective Cardenas told the Flecks that in order to continue the investigation, the officers would need permission to search the house. Ken spoke up and said he would sign a search consent form, and did so in the living room. Officer Sinnott and another officer stayed with the five people in the living room while the other officers and detectives commenced the search. While searching, Officer Kuiken and Detective Perna came across a bedroom that was padlocked. They returned to the living room and asked whose bedroom it was. Robert said that the bedroom was both his and Ken's. Ken agreed. Robert then said he had the key and gave it to Detective Perna. Detective Perna and Officer Kuiken unlocked the bedroom and searched it. On the bed they found boxes bearing Byers' initials filled with property Byers had previously described as having been taken in the theft. In the closet, they found several shotguns and rifles. Officer Kuiken returned to the living room and asked the Fleck brothers who owned the guns. The two responded that the guns belonged to both of them. Ken and Robert were then arrested and transported to the Omaha Central Police Headquarters. At no time were the Flecks given their Miranda

-3-

warnings. While being booked, Robert asked why he and Ken were being arrested for possessing guns they had inherited from their father.

Ken and Robert were initially held in the Douglas County, Nebraska jail on state charges. When the case became federal, Special Agent Rush of the Bureau of Alcohol, Tobacco, Firearms, and Explosives transported the two to federal custody. During transport, the Flecks asked Agent Rush what federal charges they were facing. Agent Rush explained that they faced federal charges of being felons in possession of firearms. Ken protested that they were just hunting rifles, and not assault rifles or pistols. Robert said the two had planned to take the guns to their sister's house because they knew they weren't supposed to have them.

The Flecks moved to suppress all statements made and evidence obtained as a result of the search. The district court suppressed only the Flecks' non-Mirandized statements made during the search following the discovery of the guns. Ken moved in limine to exclude any testimony regarding alleged insurance fraud, but the district court denied the motion. At sentencing, the district court found that the Flecks unlawfully possessed nine guns. This finding increased the base offense level from twenty, U.S.S.G. § 2K2.1(a)(4), to twenty-four, U.S.S.G. § 2K2.1(b)(1). The jury's verdict, however, supported a base offense level increase to only twenty-two under U.S.S.G. § 2K2.1(b)(1) for the involvement of three to seven firearms. The Flecks were each sentenced to sixty-three months' imprisonment plus three years supervised release.

## II.  DISCUSSION

### A.  Evidence of Other Crimes

Before trial, the district court overruled Ken's motion in limine seeking to exclude testimony regarding alleged insurance fraud. At issue was the officers'

testimony relating why they were investigating the Fleck home. The court also overruled Robert's motion for mistrial after that testimony was allowed at trial. The court held that such testimony was relevant "in the context of why [the police] [were] doing the investigation, . . . they have to show the basis for their investigation, other than a general statement of we are here to investigate a theft." Trial Tr. at 11. The court also stated that "with respect to continuity, it seems to me that the government has the right to have testimony about why they are there. And if that includes insurance fraud, then it includes insurance fraud." Id. at 9. Both Flecks argue that Federal Rules of Evidence 403 and 404(b) preclude the use of such testimony because they were not on trial for insurance fraud, the testimony was unfairly prejudicial, and it was impermissible character evidence.

At trial, the matter came up in a narrative answer from Detective Perna. He was answering the prosecutor's question of whether Detective Perna had "occasion on that date to become involved in some goings on at 48th and Saratoga?" Id. at 101. The detective launched into an explanation of the alleged insurance fraud, and there was no objection or motion to strike. Later, the prosecution asked Byers "whether or not [he knew] a theft claim was filed with an insurance carrier as a result of this break in?" Id. at 231. Both Flecks objected on grounds of hearsay, foundation, and relevance. Id. The court overruled the relevance objection since "this has been brought into issue," and did not rule on the hearsay or foundation objections. Id. Byers then testified regarding the insurance claim. During discussion outside the presence of the jury, Ken's counsel asserted that "[a] lot of this, Judge, is why I didn't want all this insurance fraud stuff brought up, because I don't think it necessarily has anything to do with this [prosecution]." Id. at 340. The court agreed. "I'm not sure how it has anything to do with anything either. It seems we are now trying a stolen property case and that's not what we're here for." Id. But the court stated, "So many doors have been opened along the way that we are in it and there is nothing we can do about it." Id. at 341.

We review a district court's rulings on a motion in limine, <u>Countrywide Services Corp. v. SIA Insurance Co., Ltd.</u>, 235 F.3d 390, 394 (8th Cir. 2000), a motion for mistrial, <u>United States v. Lacey</u>, 219 F.3d 779, 782 (8th Cir. 2000), and the admission of evidence, <u>United States v. Kenyon</u>, 397 F.3d 1071, 1079 (8th Cir. 2005), for abuse of discretion.

We agree that the district court abused its discretion in allowing testimony at trial regarding the Flecks' alleged insurance fraud. It was wholly irrelevant to the charges at issue.

One of the exceptions to the general rule that evidence of other crimes committed by a defendant is inadmissible is when the proof provides the context in which the charged crime occurred–"the res gestae." <u>United States v. Moore</u>, 735 F.2d 289, 292 (8th Cir. 1984). "A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void–without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." <u>Id.</u>

But this case is wholly different from <u>Moore</u> where other crimes evidence was permitted. "In those cases in which we have approved the use of other crimes evidence as an integral part of the context of the crime charged, the other crime evidence was closely or inextricably intertwined with the charged crime." <u>United States v. Forcelle</u>, 86 F.3d 838, 842 (8th Cir. 1996). Facts regarding the alleged insurance fraud may have been part of the explanation of why police were at the Fleck home. They did not, however, provide any context for and were not inextricably intertwined–indeed they had nothing to do with–the commission of the crime of possessing firearms as a felon. "We have often explained the other crime evidence completes the story or provides a total picture *of the charged crime*." <u>Id.</u> (emphasis added) (quotation omitted). Using this evidence to explain how the police came to be at the Fleck home in no way "completes the story" or "provides a total

-6-

picture" of the Flecks' possession of guns. We have also said that "when evidence of other crimes is so blended or connected, with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged, it is admissible as an integral part of the immediate context of the crime charged." Id. at 841 (quotations omitted). In this case, testimony about the alleged insurance fraud satisfies none of these elements. As such, the district court erred in allowing testimony at trial regarding the Flecks' alleged insurance fraud.

However, the district court's evidentiary ruling is subject to harmless error review. United States v. Medearis, 380 F.3d 1049, 1058 (8th Cir. 2004). "The test for harmless error is whether the erroneous evidentiary ruling had a substantial influence on the jury's verdict." United States v. Lupino, 301 F.3d 642, 645 (8th Cir. 2002) (quotations omitted). After reviewing the record, we cannot say that the testimony about insurance fraud had a substantial influence on the verdict. As a general matter, the testimony and other evidence presented at trial focused primarily on the possession of the guns. In light of all this clearly admissible evidence, we are convinced that the challenged testimony did not have a substantial influence on the verdict. Thus, the court's error was harmless.

## B. Motion to Suppress

The district court granted Robert's motion to suppress only with regard to statements he made in the house after officers discovered the guns in the bedroom. Robert asserts that the court should have suppressed all statements and evidence obtained as a result of the search because (1) he did not consent to a search of the house, (2) he did not voluntarily consent to the search of the bedroom, and (3) without Miranda warnings, all evidence obtained is "fruit of the poisonous tree." He also asserts that non-Mirandized statements made to Agent Rush were made during custodial interrogation. "We will affirm a district court's order denying a defendant's

-7-

motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." United States v. Hines, 387 F.3d 690, 694 (8th Cir. 2004) (quotations omitted).

### 1. Consent to Search the House and Bedroom

The Fourth Amendment protects individuals from unreasonable searches and seizures by government authorities. Generally, a warrant is required for a search to be reasonable. However, "[a] valid consent to search is an exception to the Fourth Amendment warrant requirement of the United States Constitution." United States v. Gipp, 147 F.3d 680, 685 (8th Cir. 1998). "The government may obtain consent for a warrantless search from the defendant or from a third party who possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Czeck, 105 F.3d 1235, 1239 (8th Cir. 1997) (quotation omitted). Ken and Robert Fleck are co-owners of the house that was searched, the officers were invited into the house by one of the Fleck brothers, and Ken signed a consent form to search the house. Ken or Robert's consent was sufficient.

In order to be valid, however, consent must be voluntarily given. United States v. Escobar, 389 F.3d 781, 784 (8th Cir. 2004). The government must prove, by a preponderance of the evidence, that the consent was voluntary. Czeck, 105 F.3d at 1239. "The voluntariness of a person's consent to search is a question of fact that we review under the clearly erroneous standard." Hines, 387 F.3d at 694 (quotation omitted). Consent is voluntary "if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied." United States v. Chaidez, 906 F.2d 377, 380 (8th Cir.1990) (quotation omitted). "This determination depends upon the totality of the circumstances in a particular case, including both the characteristics of the accused and the details of the interrogation." Id. (quotation omitted).

-8-

Robert argues that neither Ken's consent to search the house nor Robert's production of the key to the locked bedroom was voluntary because they were in custody, they had to wait several hours, they were never advised of their <u>Miranda</u> rights, and they were not advised that they could refuse to consent. We disagree. "The custodial status of the consenting party is not determinative [of voluntariness];" <u>Czeck</u>, 105 F.3d at 1239; Detective Perna testified that the entire investigation at the house took between two hours and two hours, twenty minutes; and nothing in the record gives us pause on any of the other factors in our voluntariness analysis. <u>See</u> <u>Chaidez</u>, 906 F.2d at 381 (discussing the factors considered regarding both the person consenting and the environment in which they consent for purposes of determining extent of voluntariness). In fact, both Flecks were familiar with law enforcement as evidenced by their former felony convictions, and neither objected to a search of the house in general or the bedroom in particular. We find that the consent to search the house was voluntary.

Robert argues that even if the consent to search the house was voluntary, the consent to search the bedroom was not. Again, we disagree. First, the bedroom was within the scope of the consent to search the house. "The standard for measuring the scope of consent under the Fourth Amendment is that of objective reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the individual?" <u>Hines</u>, 387 F.3d at 695 (quotation omitted). Ken signed the consent form giving officers permission to search the *house*. The typical reasonable person would have understood this to mean every room, the sum of which is the house. Second, Robert's production of the bedroom key constituted further indicia of consent to search the bedroom. In <u>United States v. Ware</u>, 890 F.2d 1008 (8th Cir. 1989), we held that where a defendant gave his consent to search his apartment, identified the key ring that would provide access to the apartment, and that key ring also held a key which would open a locked storage room also rented by the defendant, the search of the room was within the consent. This case is not distinguishable.

## 2.    Evidence Obtained In Absence of <u>Miranda</u> Warnings

Robert also argues that the guns found in the bedroom should be suppressed as "fruit of the poisonous tree" because neither he nor Ken was advised of his <u>Miranda</u> rights before or during the search, and because police requests for the key to the bedroom constituted interrogation.  This argument is flawed.  First, while we assume for the sake of this discussion that the Fleck brothers were in custody throughout the search of the house, we cannot say that asking for the key to the bedroom constituted interrogation.[2]  And even if we were to conclude that the question was interrogation, and that the Flecks' <u>Miranda</u> rights had been violated at that point, we would still find that the guns discovered in the bedroom were admissible.  In this circuit, we have refused to extend the fruit-of-the-poisonous-tree doctrine to exclude physical evidence derived from a voluntary statement made in the wake of a <u>Miranda</u> violation.  In <u>United States v. Villalba-Alvarado</u>, 345 F.3d 1007, 1013 (8th Cir. 2003), we held that "the exclusionary rule as applied under the Fifth Amendment does not require the suppression of physical evidence derived from a voluntary, non-<u>Mirandized</u> statement."[3]  Nothing in the record suggests that the

_____

[2]Though the officers asked a direct question of the brothers regarding the key to the bedroom, it was not the kind of investigative questioning–intended to elicit an incriminating response–that was at issue in <u>Miranda</u>.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980).  Nothing further regarding authority over the bedroom–and hence ownership of or authority over the guns found in it–was admitted by Robert in producing the key since the brothers had already told the officers they were co-owners of the entire house.

[3]In fact, the cases we relied upon in <u>Villalba-Alvarado</u> are factually indistinguishable from this case.  <u>See</u> <u>United States v. DeSumma</u>, 272 F.3d 176 (3rd Cir. 2001) (finding gun admissible, where officer asked defendant before giving him <u>Miranda</u> warnings if he had any weapons, and defendant told officer gun was in his car and gave him combination to open the car, because voluntary-statement doctrine of <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985) applied as well to derivative physical evidence); <u>United States v. Sterling</u>, 283 F.3d 216 (4th Cir. 2002) (finding gun

-10-

Flecks made any involuntary statements that led to the discovery of the guns. In fact, the only statements the Flecks can point to are their words of consent to search. They were, as we concluded above, voluntarily given. The guns were not subject to suppression because of a <u>Miranda</u> violation.

### 3. Statements Made to Agent Rush

Robert also sought to suppress the statements he made to Agent Rush while being transported to federal custody. After reviewing the record, we agree with the district court that Ken's and Robert's statements were not the product of interrogation, but were volunteered. Rush testified that the only thing he remembered asking the two was how they liked the food at the Douglas County Jail. It can hardly be said this was in some way calculated to elicit an incriminating response from either brother. In fact, it was the Flecks' initiation of questioning of Agent Rush that led to their incriminating statements. Their statements to Agent Rush were properly admitted.

### C. Sentencing Issues

Ken and Robert challenge the court's finding at sentencing that they possessed nine guns. The government cross-appeals the district court's conclusion that Robert's 1991 conviction for burglary of a commercial building was not a crime of violence. These appeals concern the district court's application of the sentencing guidelines. The Supreme Court has now rendered the sentencing guidelines advisory, <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), by excising two statutory provisions which (1) mandated that courts impose sentences within applicable guideline ranges, absent circumstances justifying a departure (18 U.S.C. § 3553(b)(1)); and (2) required

---

admissible, where officers searching defendant's home asked him, without <u>Miranda</u> warnings, if he had any other weapons, and defendant told officer shotgun was in his truck).

appellate courts to review sentencing departures de novo (18 U.S.C. § 3742(e)). The rest of the statute remains, including 18 U.S.C. § 3742(a)(2) and (b)(2), which provide for appeal by a defendant or by the government where the sentence "was imposed as a result of an incorrect application of the sentencing guidelines." Id. Post-Booker, we continue to review the district court's application of the guidelines de novo, and its findings of fact underlying that application for clear error. United States v. Paine, 407 F.3d 958 (8th Cir. 2005). "If the court of appeals determines that the sentence was imposed . . . as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate." 18 U.S.C. § 3742(f)(1). In such a case, we will remand where the error is not harmless. Williams v. United States, 503 U.S. 193, 203 (1992) (quoting 18 U.S.C. § 3742(f)(1) ("[O]nce the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed."); see United States v. Mashek, 406 F.3d 1012, 1017 (8th Cir. 2005).

Our review of the correct interpretation and application of the advisory regime remains important "because . . . district court[s] must continue to determine the appropriate guidelines sentencing range, as it did pre-Booker, before it considers the other factors in 18 U.S.C. § 3553(a)." United States v. Mathijssen, 406 F.3d 496, 498 (8th Cir. 2005) (quotation omitted). Additionally, retaining, through appellate review, consistency in the guidelines' interpretation and application "ensures fidelity to Congress's goal of diminishing sentencing disparities while preserving the constitutionality of the now-advisory guidelines." Mashek, 406 F.3d at 1016.

### 1. Number of Guns Found at Sentencing

Robert moved for a decrease in the offense level under U.S.S.G. § 2K2.1(b)(2), arguing that the guns found in the bedroom were possessed solely for lawful sporting purposes. He argues the district court erred in not determining whether and how many of the guns were so possessed. Ken argues that (1) there was no authenticating witness for the evidence–Exhibit 3–which the government provided at sentencing to establish that the defendants possessed three guns that were not addressed at trial, (2) the court erred in overruling his hearsay, foundation, and relevance objections to Exhibit 3, and (3) he did not have a chance to confront the individual who prepared Exhibit 3, in violation of his Sixth Amendment Confrontation Clause right.

#### a. Possessed Solely for Sporting Purposes

Robert was not eligible for the sporting-purpose decrease. The record is clear that the district court heard Robert's motion, considered it, and asked for counterargument from the government. The government pointed out that Robert was subject to U.S.S.G. § 2K2.1(a)(4), which precludes him from receiving the § 2K2.1(b)(2) decrease. Section 2K2.1(b)(2) states that it is available to a defendant, "other than a defendant subject to [§ 2K2.1] (a)(1), (a)(2), (a)(3), (a)(4), or (a)(5)." Thus, the court correctly applied the guidelines in denying the decrease.

#### b. Exhibit 3

The court did not err in overruling Ken's evidentiary and Confrontation Clause objections to Exhibit 3. The rules of evidence do not apply at sentencing, but information considered by the sentencing court must have "sufficient indicia of reliability to support [its] probable accuracy." United States v. Jones, 195 F.3d 379, 385 (8th Cir. 1999) (quoting U.S.S.G. § 6A1.3(a)). Nothing in the record causes us to doubt the reliability of Exhibit 3. Further, the Confrontation Clause does not apply

at sentencing hearings.  <u>United States v. Wallace</u>, No. 04-1265, slip op. at 4 (8th Cir. May 23, 2005).

### 2.    Government's Cross-Appeal

The government cross-appeals the district court's conclusion that Robert's 1991 conviction for burglary of a commercial building was not a crime of violence.  The district court pegged Robert's base offense level at twenty, under U.S.S.G. § 2K2.1(a)(4), based on one previous felony that was a crime of violence.  The government argues it should be twenty-four, under U.S.S.G. § 2K2.1(a)(2), because Robert's burglary of a Keno parlor is an additional crime of violence.  The district court considered the government's argument at sentencing, but looked to Robert's actual conduct during the burglary as alleged in the PSR and police reports about the burglary.  The court concluded that "I just don't see any evidence that this is a crime that puts anyone in peril, other than the property of the . . . Keno establishment." Sent. Tr. at 416.  As a result, Robert was sentenced based on only one prior felony conviction for a crime of violence.

It is difficult to understand the district court's ruling in this instance.  This court has consistently held that burglary of a commercial building is a crime of violence as defined by U.S.S.G. § 4B1.2(a).  <u>United States v. Peltier</u>, 276 F.3d 1003, 1006 (8th Cir. 2002) (citing <u>United States v. Hascall</u>, 76 F.3d 902, 904 (8th Cir. 1996)); <u>United States v. Blahowski</u>, 324 F.3d 592, 594-96 (8th Cir. 2003); <u>United States v. Mohr</u>, 407 F.3d 898, 901-02 (8th Cir. 2005).  And "[t]he evidentiary facts specific to a defendant's actual conduct in the course of committing a burglary are irrelevant in determining whether that conviction is a predicate offense under the career offender guideline." <u>Blahowski</u>, 324 F.3d at 595.  Robert's prior offense of burglary of a commercial establishment constitutes a crime of violence, and the district court's conclusion to the contrary was error.  As a result, Robert's sentence "was imposed . . . as a result of an incorrect application of the sentencing guidelines,"  18 U.S.C. §

-14-

3742(f)(1), and nothing in the record indicates that the district court would have imposed the same sentence had it correctly applied them. Thus, the district court 's error was not harmless, so we remand with instructions that the district court resentence Robert in light of the fact that his 1991 conviction for burglary constitutes a crime of violence.

### 3. Booker Issue

Robert and Ken raise a Booker challenge to their sentences, arguing they are based on facts found by the district court by a preponderance of the evidence, and not by the jury beyond a reasonable doubt, in violation of their Sixth Amendment rights. The district court found that the Flecks possessed nine guns, six more than the three the jury convicted them of unlawfully possessing. Both appeal their sentences based on this finding.

The district court sentenced the Flecks according to the sentencing guidelines at a time when they were mandatory. While the Flecks' cases were still on direct appeal, the Court declared in Booker that the guidelines were unconstitutional and in violation of a defendant's Sixth Amendment rights since they provided for judicial fact-finding under a mandatory sentencing scheme. The Court stated that if the guidelines merely advised courts by suggesting particular sentences based on a set of facts–found by the judge or jury–then the Sixth Amendment would not be implicated. Booker, 125 S.Ct. at 750. Thus, the Court removed the constitutional infirmity by excising those statutory provisions that made the guidelines mandatory, rendering them advisory. The holding in Booker applies "to all cases on direct review," subject to "ordinary prudential doctrines" of review such as plain- and harmless-error. Id. at 769. We now know the district court committed error by applying the guidelines as mandatory in sentencing the Flecks. See United States v. Pirani, 406 F.3d 543 (8th Cir. 2005) (en banc). But, as our opinion in Pirani points out, if the Flecks did not

preserve this error for appellate review by making a timely objection stating the grounds for objection to the district court, we will review for plain error. Id. at 550.

While both Flecks made objections to the district court's application of some guideline provisions, including objections to the evidence used in determining the number of guns they possessed, neither objected based on Apprendi or Blakely, or argued that the guidelines were unconstitutional, which is required to preserve Booker error.[4] See id. at 549. Thus, our review is for plain error. Under the plain error doctrine, before we can correct an un-preserved error, there must be (1) error, (2) that is plain, (3) that affects substantial rights. Once those three requirements are met, an appellate court may then, in its discretion, notice a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. at 550 (reciting the plain error factors in United States v. Olano, 507 U.S. 725 (1993) as articulated in Johnson v. United States, 520 U.S. 461 (1997)). "Where the law at the time of trial was settled and clearly contrary to the law at the time of appeal–it is enough that an error be 'plain' at the time of appellate consideration." Id. (quotation omitted). The defendant has the burden of proving

_____

[4]Robert's counsel did object at sentencing to the government's evidence of three guns that had not been addressed at trial, arguing it was an effort by the government "to fill in the blanks, what they should have provided at the time of trial." Sent. Tr. at 412. He continued "[t]he evidence from the trial is again what the evidence is; not this. They failed to produce this at the time of trial." Id. at 413. While this objection may be a *potential* constitutional argument, it does not drop the other shoe and actually make that argument. It is akin to the defendant's argument in Pirani that because his attorney stated "when you talk about sending people to prison, I believe the burden of proof should be beyond a reasonable doubt," he had preserved Booker error. Pirani, 406 F.3d at 550. We rejected that argument, stating that because he had not coupled that statement with a specific reference to Apprendi, Blakely, or the Sixth Amendment, Pirani had not preserved his error. Id. Robert's counsel did not so couple his statement, and thus it is likewise insufficient to preserve Booker error. Ken admits in his brief that he did not preserve Booker error and is subject to plain error review.

plain error.  Id.  As was clear in Pirani, it is clear here that the Flecks can show that the first two factors are met.  The district court committed Booker error, and that error is plain, "that is, clear or obvious, at this time."  Id.

In order to satisfy the third Olano factor, the Flecks must demonstrate a reasonable probability that they would have received a more favorable sentence had the district court not committed Booker error and used the guidelines in an advisory capacity.  Id. at 552.  Robert does not argue that he would have received a more favorable sentence, rather, he essentially argues that because his sentence is not based on the evidence found by the jury, it should be remanded for resentencing.  But as was the case in Pirani, the fact that the defendant's sentence involves a Sixth Amendment violation does not mean he would have received a more favorable sentence under an advisory regime.  Id. at 553.  Nor does the record indicate that would have been the case.  Though Robert was sentenced at the low end of the sentencing range, that is "insufficient, without more, to demonstrate a reasonable probability that the court would have imposed a lesser sentence absent the Booker error."  Id.  Robert has not met his burden under the third Olano factor.

Ken, however, has met his burden under the third Olano factor.  Ken argues, and the record bears this out, that the judge wanted to give Ken a lesser sentence than the judge felt he could give Ken under the guidelines.  During discussion at sentencing, it is clear the court felt that Ken was less culpable than Robert, and specifically stated "[i]f the court had a way legally to [give Ken] a lower sentence I would."  Sent. Tr. at 452.  In Pirani, we said "[i]t would be relevant to plain error prejudice if the district court had opined that the sentence produced by the mandatory Guidelines was unreasonable."  406 F.3d at 553 n.6.  Here, the district court went beyond merely stating the guidelines were unreasonable, and put on record that if he could give Ken a lesser sentence, he would.  The third Olano factor is satisfied.

Because Ken has met his burden on the first three <u>Olano</u> factors, we choose to exercise our discretion under the fourth factor. Because Ken has shown a reasonable probability that he would have received a more favorable sentence had the district court treated the guidelines as advisory, refusing to allow him to be resentenced would leave Ken incarcerated for a longer period than that to which the district court would have sentenced him under an advisory regime. We find that this would seriously affect the fairness, integrity, and public reputation of the judicial proceedings that placed Ken in prison. For this reason, we remand with instructions that the district court resentence Ken in light of the advisory nature of the guidelines.[5]

## III.    CONCLUSION

For the foregoing reasons, we affirm the convictions of Robert Fleck and Ken Fleck, but remand for resentencing in each of their cases.

_____

---

[5]Ken also appeals the district court's finding that he committed his offense less than two years after release from prison under U.S.S.G. § 4A1.1. Because Ken will be resentenced under the advisory guidelines, we decline to address this argument.