# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2650

_____

United States of America

*Plaintiff - Appellee*

v.

Dion Thomas

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa, Waterloo

_____

Submitted: April 17, 2014
Filed: July 28, 2014

_____

Before SMITH, COLLOTON, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Dion Thomas of two heroin-related offenses. The district court[1] sentenced him to 240 months' imprisonment and eight years of supervised release. On appeal, he challenges the district court's (1) grant of the government's

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

motion in limine over his Federal Rule of Evidence 404(b) objection, which allowed witnesses to testify about Thomas's alleged crack distribution, and denial of Thomas's objection to testimony about money laundering; (2) denial of Thomas's motions for new counsel; (3) calculation of Thomas's offense level by considering uncharged, crack-distribution conduct; and (4) calculation of Thomas's criminal history score that contemplated Thomas's state-court conviction for cocaine possession. We affirm.

## I. *Background*

Thomas, a resident of Chicago, Illinois, began visiting relatives periodically in Waterloo, Iowa, as early as the fall of 2009. He visited two of his mother's siblings—Katina McKenzie Jackson ("Katina") and Essex McKenzie ("Essex"). During these visits, Thomas supplied Katina and Essex with crack and heroin for their personal use as well as for redistribution. Katina and Essex introduced Thomas to some of their drug acquaintances. They identified Thomas to these acquaintances as their drug source. Thomas began supplying one of these individuals, Arthur Scott, with up to 250 grams of heroin each month. The government intercepted phone conversations between Thomas and Scott, several of which involved heroin transactions.

Thomas also "fronted"[2] heroin to several other individuals in Waterloo who then redistributed to customers. Some of these customers knew Thomas because they observed Thomas distribute large quantities of heroin to redistributors like Scott, Katina, or Essex. Additionally, law enforcement purchased 0.54 grams of heroin from Thomas during a controlled buy. The purchaser's hidden audio transmitter failed to capture the contents of the conversation between Thomas and the purchaser.

---

[2]"'Fronting' denotes a transaction in which the buyer receives drugs on credit and repays the seller from the resale proceeds." *United States v. Slagg*, 651 F.3d 832, 841 n.3 (8th Cir. 2011) (citation omitted).

However, law enforcement observed Thomas actually consummate the transfer of the heroin.

Other evidence against Thomas included a jailhouse informant who testified that Thomas told him of the controlled heroin purchase. Thomas told the informant that Thomas hoped that the controlled purchase would be useless as evidence against him because of the failed audio recording. The informant also testified that Thomas informed him about Katina's and Essex's involvement, as well as the typical prices and quantities at which Thomas sold heroin. Thomas also told the informant about Thomas's heroin purchases in Chicago.

In December 2011, a federal grand jury indicted Thomas and five others with heroin-related offenses. Thomas was charged with one count of conspiracy to distribute and possess with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846, and 851, and one count of distribution of 0.54 grams of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 851. Authorities arrested Thomas in March 2012. He pleaded not guilty to the charges and was appointed counsel. He proceeded to trial in August 2012.

A jury convicted Thomas of both of the charged counts. The presentence report (PSR) calculated Thomas's base offense level as 34 and his criminal history category as IV. The PSR enhanced Thomas's offense level by three levels because he was a manager or supervisor of the conspiracy. Thus, with an offense level of 37 and a criminal history category of IV, the Guidelines range was 292–365 months' imprisonment. The district court granted Thomas's motion for downward variance and sentenced him to concurrent 240-month sentences with eight years of supervised release.

## II. *Discussion*

On appeal, Thomas challenges the district court's (1) grant of the government's motion in limine over his Rule 404(b) objection, which allowed witnesses to testify about Thomas's alleged crack distribution, and denial of Thomas's objection to testimony about money laundering; (2) denial of Thomas's motions for new counsel; (3) consideration of Thomas's uncharged, crack-distribution conduct in calculating Thomas's offense level; and (4) including Thomas's state-court conviction for cocaine possession in calculating Thomas's criminal history score.

## A. *Rule 404(b)*

Thomas contends that the district court violated Federal Rule of Evidence 404(b) by allowing testimony regarding Thomas's alleged crack distribution and alleged money laundering. "We review the admissibility of evidence under Rule 404(b) for abuse of discretion." *United States v. Katz*, 445 F.3d 1023, 1029 (8th Cir. 2006) (quotation and citations omitted). District courts have "broad discretion in admitting such evidence and will be reversed only if such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." *Id.* (quotations and citations omitted).

Rule 404(b) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, such evidence may be admitted "for another purpose, such as proving motive, opportunity, *intent*, preparation, plan, *knowledge*, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2) (emphases added). We have recognized that "Rule 404(b) is a rule of inclusion, prohibiting only evidence that tends solely to prove the defendant's criminal disposition." *United States v. Young*, Nos. 12-2527, 12-2593, 2014 WL 2134579, at *4 (8th Cir. May 23, 2014) (quotation and citation omitted). Thus, Rule 404(b) does not exclude evidence of prior bad acts that are probative of the charged crime. *United States v. Heidebur*, 122 F.3d 577, 579 (8th Cir. 1997).

-4-

We recently explained in *Young*:

> Rule 404(b) applies only to extrinsic, not intrinsic, evidence. *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006). "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred." *Id.* "Such evidence is admitted because the other crime evidence 'completes the story' or provides a 'total picture' of the charged crime." *Id.* (citation omitted). . . . Intrinsic evidence may help to fill the gaps in the jury's understanding of the crime charged. *See* [*United States v.*] *Hall*, 604 F.3d [539,] 543–44 [(8th Cir. 2010)].

*Id.* at *6. Additionally, "[a] jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Fleck*, 413 F.3d 883, 890 (8th Cir. 2005) (quotation and citation omitted).

> [W]hen evidence of other crimes is so blended or connected, with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged, it is admissible as an integral part of the immediate context of the crime charged.

*Id.* (quotation and citation omitted). Thus, intrinsic, or res gestae, evidence may implicate the defendant in other acts or crimes. *United States v. LaDue*, 561 F.3d 855, 858 (8th Cir. 2009).

### 1. *Crack-Distribution Testimony*

Prior to trial, the government filed a motion in limine asking the district court to "enter a pretrial order admitting into evidence testimony regarding defendant's crack cocaine distribution." The government argued:

The evidence as to the defendant's distribution of, and transport of, crack cocaine along with heroin, is part and parcel of the crime with the charged crime of conspiracy to distribute heroin. The United States anticipates that several witnesses will testify that they received both crack cocaine and heroin from the defendant, and that the defendant brought both crack cocaine and heroin with him to Waterloo from Chicago. The United States anticipates that an additional witness will testify that he received large quantities of crack cocaine from the defendant. These activities occurred during the same time period as the charged conspiracy, involved the same group of people, and trips from Chicago to Waterloo. The evidence, therefore, is appropriate evidence of the activities of the charged conspiracy.

The district court granted the motion, finding that such evidence was admissible as intrinsic evidence and admissible under Rule 404(b).

The crack-distribution evidence presented at trial was consistent with the government's pretrial characterization of that evidence. For example, Essex introduced crack customers to Thomas, who even redistributed crack in Waterloo. Also, Katina bought crack for personal use and redistribution, much like she did with heroin. Scott also purchased crack from Thomas. Several heroin coconspirators knew that Thomas distributed crack as well as heroin to other coconspirators.

On appeal, Thomas contends that crack distribution evidence was not "part and parcel" of the heroin conspiracy. As proof, Thomas highlights that one witness who knew of his crack distribution knew nothing of Thomas's heroin distribution. He further avers that the crack distribution evidence violated Rule 404(b) because it was immaterial, was not similar in kind to the heroin evidence, and produced a prejudicial effect that substantially outweighed its probative value.

Upon review, we hold that the district court correctly concluded that the crack-distribution evidence constituted intrinsic evidence. The evidence of Thomas's crack

distribution was "so blended or connected" with the heroin conspiracy and distribution that it helped "explain[ ] the circumstances thereof [and] is . . . an integral part of the immediate context of the crime charged." *Fleck*, 413 F.3d at 890 (quotation and citation omitted). Several witnesses testified that they received both heroin and crack from Thomas. Thomas transported both crack and heroin during his treks from Chicago to Waterloo. Coconspirators introduced Thomas to both heroin users/redistributors and crack users/redistributors. In one of the intercepted calls, Thomas arranged both a heroin and a crack transaction. As the government notes in its brief, Thomas "blended his heroin and crack cocaine business together to the extent that it would be nearly impossible at times to separate the two." Thus, the crack-distribution evidence here constituted intrinsic evidence that Rule 404(b) does not prohibit.

### 2. *Money Laundering Testimony*

Thomas called two witnesses at trial on his behalf, one of which was his mother. His mother testified that Thomas was with her in Chicago on June 23, 2011—the day of the controlled buy. Based on this alibi, Thomas averred that he could not have been involved in the controlled buy that occurred in Waterloo that day. In rebuttal, the government presented two witnesses. One witness was the manager of a casino in Waterloo who testified that Thomas's "Players Club" card was used in the casino on the afternoon of the controlled buy, contradicting Thomas's mother's testimony that he was in Chicago that day.

The government's evidence that Thomas's Player Club card was used that day established only that someone used the card in Waterloo, not that Thomas himself used the card there. To further bolster its rebuttal, the government called Special Agent Matthew Schalk with the Iowa Division of Criminal Investigations. Special Agent Schalk was stationed at the casino on May 15, 2011, which was approximately a month-and-a-half before the controlled buy. Special Agent Schalk saved video surveillance of Thomas using his Player's Club card that day. Typically, however, the

casino erased video footage of its gamblers after a few weeks. Thus, there was no video footage of Thomas using the card on June 23, the day of the controlled buy. The footage showing him using the card a month-and-a-half earlier did not fully rebut his alibi for June 23 but was some evidence that he had used the card in the past.

The government explained the absence of video evidence for June 23 by offering the testimony of Special Agent Schalk. Special Agent Schalk's testimony included his suspicions that Thomas was laundering money at the casino based on his May15 observations. Special Agent Schalk explained that someone using Thomas's card

> was putting a large amount of bills into 2 different slot machines on the gaming floor, and it was unusual because he was doing it simultaneously at the same time to both slot machines and wasn't playing any spins. He wasn't—he was just putting the money in and not playing any of the money off.

He then cashed out of the machines without ever playing. Special Agent Schalk later stated that "[i]t's unusual behavior for somebody to simply put a lot of bills into 2 different slot machines at the same time and then cash them out without playing," so he suspected Thomas engaged in "some type of money laundering." The district court overruled Thomas's objection. The government never again mentioned money laundering during Thomas's trial.

Thomas argues on appeal that the district court erred in allowing this testimony because it was not relevant to any element of the charged offenses and constituted a prior bad act that unfairly prejudiced him.

Federal Rule of Evidence 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." The money-laundering

evidence is relevant because it makes Thomas's mother's testimony less probable. The government sought to connect Thomas's Player's Club card to him, and it attempted to do so by introducing video evidence of Thomas using the card less than two months before the controlled heroin purchase. Thus, evidence of Thomas using the Player's Club card in the casino on May 15 is relevant.

In addition, this testimony had probative value because it explained to the jury why video evidence existed to demonstrate his presence at the casino in May but not June. This is intrinsic evidence because it completes the story of the crime and provides the necessary context. *See Johnson*, 463 F.3d at 808. The evidence was not unfairly prejudicial because the government only presented it as rebuttal testimony to Thomas's alibi witness. Also, the government never again broached the issue. *See United States v. Baldenegro-Valdez*, 703 F.3d 1117, 1127 (8th Cir. 2013). Thus, we reject Thomas's evidentiary challenges.

## B. *Motion for New Attorney*

Thomas was arrested on March 8, 2012. The district court scheduled trial for August 20, 2012. Because Thomas was indigent, the magistrate judge appointed Mark Meyer to represent Thomas on March 28, 2012. On June 27, 2012, Thomas filed a pro se motion for a new attorney. Thomas argued that Meyer had "not filed anything on [his] behalf." Thomas was "constantly asking [Meyer] to file motions on [his] behalf," but Meyer failed to do so. Thomas argued that Meyer did "not have [his] best interest."

The magistrate judge conducted a hearing on the motion on July 2, 2012. Thomas reiterated his concerns and noted that Meyer was not defending him but had merely advised him to accept a guilty plea. He also complained that Meyer did not show him any statements from witnesses that implicated Thomas. When asked what motion he wished Meyer to file, Thomas responded:

I mean, I'm not a lawyer, but I'm pretty sure he can find me—if I'm charged with something, I'm pretty sure there is a motion that can be filed as far as this case is. I feel like I'm just sitting here and I'm at the same stage I was at, and all he wants me to do is just take a plea agreement.

Meyer then informed the magistrate judge that he and Thomas

have discussed the evidence many times. I've even reserved a room at the jail where he could—part of the evidence in the case—this was a case where there was wiretaps. And so I reserved a room where he could actually listen to the recorded conversations, which he's done. And then I've discussed the other evidence in the case again.

So I haven't provided him copies of anything because, according to the discovery, standard discovery order, I can't. But I did, and I think he's got it with him here today, I sent him a several page letter summarizing what the evidence was and what my recommendation would be as far as whether to accept a plea agreement or go to trial, and the pitfalls he might run into if he did go to trial. So he knows as much about the case as I do.

In addition to the testimony at the hearing, The magistrate judge noted counsel's experience and history before the court in other cases. The magistrate judge denied Thomas's motion for new counsel.

After trial, Thomas again filed a pro se motion for new counsel based on the same grounds. Thomas complained that Meyer never met with him prior to trial as the magistrate judge ordered him to do at the previous hearing. The magistrate judge again denied Thomas's motion for new counsel on January 3, 2013. Thomas then retained private counsel on January 25, 2013, with the help of his mother.

On appeal, Thomas argues that the magistrate judge "erred when he denied [Thomas's] pretrial motion for different court appointed counsel. There was a significant lack of communication between [Thomas and Meyer] to the point where [Thomas] did not receive adequate legal counsel."

"The Sixth Amendment guarantees a criminal defendant the right to counsel." *United States v. Baisden*, 713 F.3d 450, 454 (8th Cir. 2013) (citation omitted). We have explained that "[a]ppointment of new counsel is warranted only when the defendant demonstrates justifiable dissatisfaction with his appointed attorney." *United States v. Barrow*, 287 F.3d 733, 737 (8th Cir. 2002) (citation omitted). We have recognized:

> When faced with a motion to appoint substitute counsel, the district court must balance several factors, including the need to ensure effective legal representation, the need to thwart abusive delay tactics, and the reality that a person accused of crime is often genuinely unhappy with an appointed counsel who is nonetheless doing a good job. The court must conduct an adequate inquiry into the nature and extent of an alleged breakdown in attorney-client communications. The focus of the justifiable dissatisfaction inquiry is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney. Last minute requests to substitute defense counsel are not favored.

*Id.* at 738 (quotations and citations omitted). Furthermore, we have acknowledged:

> Justifiable dissatisfaction includes an irreconcilable conflict or a complete breakdown in communication. But it does not include a defendant's frustration with counsel who does not share defendant's tactical opinions but continues to provide zealous representation. Thus, a defendant has no right to an attorney who will docilely do as she is told or to a "meaningful relationship" with appointed counsel.

*Baisden*, 713 F.3d at 454 (citations omitted).

-11-

Based on our review of the record, including the testimony provided at the hearing, Thomas has failed to demonstrate justifiable dissatisfaction with Meyer. Although Thomas complained that Meyer did not file any motions on his behalf, Thomas identified no motions that Meyer should have filed in his defense. Thomas's contention that he had not met or discussed the case with Meyer boiled down to a matter of credibility. The magistrate judge chose to believe Meyer's testimony that he had discussed the evidence many times with Thomas and that Meyer had reserved a room at the prison where Thomas could listen to the contents of the wiretaps. We also conclude that Meyer's failure to move for review of Thomas's conditions of release did not prejudice him. In fact, Meyer filed such a motion on the day of the new-counsel hearing, and the magistrate judge denied the motion because Thomas had already had a similar hearing in Chicago. Consequently, Thomas could demonstrate only "frustration with counsel who d[id] not share [his] tactical opinions." *See Baisden*, 713 F.3d at 454. Because Thomas failed to show a *justifiable* dissatisfaction with Meyer at the time of the motion and hearing, the magistrate judge did not abuse his discretion in denying Thomas's motion for new attorney.

Thomas accentuates alleged errors that Meyer made at trial. As the government notes, however, ineffective-assistance claims are best left for collateral proceedings like § 2255 petitions. *United States v. Thompson*, 690 F.3d 977, 992 (8th Cir. 2012). We decline to accept Thomas's invitation to address Meyer's alleged ineffective assistance at this time.

C. *Offense Level Calculation*

Thomas's PSR attributed 769.44 grams of heroin and 1,318 kilograms of crack to him. Because he was not charged or tried for crack offenses, Thomas's crack activities were treated as relevant conduct in committing the heroin offenses. When the PSR converted these quantities to their marijuana equivalents, the heroin converted to 769.44 kilograms of marijuana, and the crack converted to 4,706.93 kilograms of marijuana. Pursuant to U.S.S.G. § 2D1.1, this amount of crack rendered

an offense level of 34, whereas the heroin alone would have rendered an offense level of 30. Thus, Thomas argues, his offense level of 34 was erroneously calculated based on crack quantities despite the government charging him with only heroin offenses.

The PSR recommended a criminal history category of IV. It also suggested a three-level enhancement because he was a manager or supervisor in the offense. Thus, his adjusted offense level was 37, and his criminal history category was IV. This resulted in a Guidelines range of 292–365 months. If the court ignored evidence of Thomas's crack distribution, Thomas's offense level would be a 33, resulting in a Guidelines range of 188–235 months.

Thomas objected to the PSR's use of crack quantities to calculate his offense level, arguing that it violated his Fifth, Sixth, and Fourteenth Amendment rights. The district court overruled Thomas's objection, noting that "[t]he Eighth Circuit has consistently rejected arguments that a district court's finding of sentencing facts using a preponderance of the evidence standard violates the Fifth and Sixth Amendments." The district court also rejected Thomas's due-process argument by noting that "given the advisory nature of the Guidelines and the fact that a district court judge may not exceed the statutory maximum, a district court's determination of sentencing facts using a preponderance of the evidence standard never violates due process." The district court varied downward from the Guidelines range and imposed a 240-month sentence.

On appeal, Thomas argues, "Because [his] guideline sentence was based entirely on the crack cocaine quantity for which he was not charged, tried, or convicted, his Fifth, Sixth, and Fourteenth Amendment rights were violated." More specifically, he contends that he was never indicted on crack charges or found guilty by a jury for violating crack offenses. He also contends that the district court violated his right to due process as a result.

-13-

"The base offense level for drug offenses under the Guidelines is based upon drug quantity, which may include types and quantities of drugs not specified in the count of conviction if they are relevant conduct." *United States v. Ault*, 446 F.3d 821, 823 (8th Cir. 2006) (quotation, alteration, and citation omitted). Relevant conduct includes "all acts and omissions of the defendant that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* (quotation, alteration, and citation omitted). Factors we consider in determining whether actions constitute "relevant conduct" include "the similarity, regularity, and temporal proximity of the charged and uncharged conduct." *Id.* (citations omitted). This is a factually intensive inquiry that is best left for district courts. *Id.*

After *Booker*,[3] "judicial factfinding is permissible at sentencing so long as the district court understands that the sentencing guidelines are advisory only." *United States v. Cruz-Zuniga*, 571 F.3d 721, 726 (8th Cir. 2009) (quotation and citation omitted). Thus, the district court may sentence a defendant based upon judge-found facts and uncharged relevant conduct so long as the district court does not impose a sentence above the statutory maximum for the crime of conviction. *Id.* Judge-found facts need be established only by a preponderance of the evidence. *Id.* The district court may consider charged, uncharged, dismissed, and acquitted conduct as relevant conduct. *United States v. Whiting*, 522 F.3d 845, 850 (8th Cir. 2008).

Here, the district court did not err by considering Thomas's crack distribution activities. First, the district court undoubtedly considered the Guidelines range advisory. It sentenced Thomas to only 240 months' imprisonment—well below the calculated Guidelines range. Additionally, the district court referred to the Guidelines as "advisory" several times throughout the sentencing hearing. Thomas's crack distribution within Iowa constitutes relevant conduct. His crack distribution and heroin distribution were "part of the same course of conduct." *See Ault*, 446 F.3d at

---

[3] *United States v. Booker*, 543 U.S. 220 (2005).

-14-

823. The offenses were very similar (distribution of controlled substance), proceeded along the same channels as his heroin distribution, occurred at the same time and in the same locations, and involved many of the same customers and redistributors. *See id.* As a result, the district court did not err in considering this uncharged conduct. *See Whiting*, 522 F.3d at 850.

Thomas argues that our cases involving the district court's consideration of uncharged drug *quantities*, rather than uncharged drug *types*, are inapplicable. *See, e.g.*, *Cruz-Zuniga*, 571 F.3d at 726; *United States v. Davis*, 457 F.3d 817, 825 (8th Cir. 2006). However, this circuit has also recognized that the district court may consider uncharged offenses and not simply uncharged quantities, including other drug offenses. *See, e.g.*, *United States v. Howell*, 606 F.3d 960, 963–64 (8th Cir. 2010) (considering robbery for a felon-in-possession charge); *Ault*, 446 F.3d at 823 (considering other drug types). "The district court may consider as relevant conduct all drugs that the government shows by a preponderance of the evidence were a part of the same course of conduct or common scheme as the conspiracy, even where the defendant was acquitted of such conduct." *United States v. Gordon*, 510 F.3d 811, 817 (8th Cir. 2007) (citations omitted). Thus, relevant conduct is not limited only to uncharged quantities but also uncharged offenses. Consequently, we reject Thomas's indictment and jury trial arguments. We also reject Thomas's due-process challenges because we have already determined that increasing punishment within the statutory range based on judge-found facts does not violate a defendant's constitutional right to due process. *See, e.g.*, *United States v. Villareal-Amarillas*, 562 F.3d 892, 898 (8th Cir. 2009); *United States v. Garcia-Gonon*, 433 F.3d 587, 593 (8th Cir. 2006).

Thomas contends that the Supreme Court's recent decision in *Alleyne v. United States* calls into question these previous decisions. The Court in *Alleyne* held that

> [a]ny fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt.

Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an "element" that must be submitted to the jury.

133 S. Ct. 2151, 2155 (2013). Thomas latches onto specific language in *Alleyne* where the Court stated:

> As noted, the essential Sixth Amendment inquiry is whether a fact is an element of the crime. When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury. It is no answer to say that the defendant could have received the same sentence with or without that fact. It is obvious, for example, that a defendant could not be convicted and sentenced for assault, if the jury only finds the facts for larceny, even if the punishments prescribed for each crime are identical. One reason is that each crime has different elements and a defendant can be convicted only if the jury has found each element of the crime of conviction.

*Id.* at 2162. In applying this analogy, Thomas contends that he has been convicted for crack crimes (assault) despite the jury finding only heroin crimes (larceny). Thus, Thomas avers, *Alleyne* calls into question our previous cases, and this panel should abandon them. *See Villareal-Amarillas*, 562 F.3d at 898 n.4 ("[W]e may reconsider a prior panel's decision if a supervening Supreme Court decision undermines or casts doubt on the earlier panel decision." (quotation and citation omitted)).

Thomas is incorrect. First, he was never found guilty of crack crimes. The criminal conduct associated with crack offenses increased only his advisory Guidelines range. Second, neither his statutory minimum nor maximum punishment changed as a result of the district court's consideration of the crack crimes, and the district court sentenced Thomas within the statutory range for his heroin offenses. *See* 21 U.S.C. § 841(b)(1)(B)(i) (statutory range for conspiracy to distribute over 100

grams of heroin is 5–40 years' imprisonment; Thomas was sentenced to 20 years' imprisonment). Third, the *Alleyne* Court expressly limited its holding, making it inapplicable to this case, stating:

> In holding that facts that increase mandatory minimum sentences must be submitted to the jury, we take care to note what our holding does not entail. Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment. *See, e.g.*, *Dillon v. United States*, 560 U.S. ____, ____, 130 S. Ct. 2683, 2692, 177 L. Ed. 2d 271 (2010) ("[W]ithin established limits[,] . . . the exercise of [sentencing] discretion does not contravene the Sixth Amendment even if it is informed by judge-found facts" (emphasis deleted and internal quotation marks omitted)); *Apprendi*, 530 U.S., at 481, 120 S. Ct. 2348 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute").

*Alleyne*, 133 S. Ct. at 2163 (footnote omitted). Thus, *Alleyne* is inapposite. Consequently, the district court did not err in considering Thomas's crack-distribution conduct when calculating his advisory guidelines offense level.

## D. *Criminal History Calculation*

In calculating Thomas's criminal history category, the PSR determined that Thomas had eight criminal history points, placing him in category IV. The PSR awarded two points for an August 2009 conviction from Cook County, Illinois, for possession of between 15–100 grams of cocaine. In January 2009, police performed a traffic stop on a vehicle that Thomas occupied. During a search of the vehicle, police found cocaine, a small amount of cannabis, and $12,015 in U.S. currency. Thomas objected to this portion of the PSR, arguing that this cocaine conviction occurred during the alleged conspiracy for which he was found guilty here and thus

constituted relevant conduct. Thomas noted that, if this conviction was not included separately in his criminal history calculation, he would have a criminal history category of only III, leading to a Guidelines range of 262–327 months. The district court rejected Thomas's contention, concluding that the conviction was severable and distinct from the present conspiracy. The district court noted that the evidence presented at trial established that Thomas joined the instant conspiracy in August 2009 at the earliest, and the events giving rise to this state conviction occurred seven months earlier in January 2009. The conviction also occurred in a different state, and no evidence connected that conviction with the present conspiracy. Finally, the government did not use that conviction to prove the current offense.

On appeal, Thomas argues that the district court erred, especially where the district court found that Thomas's crack distribution was relevant conduct that factored into his offense level. Furthermore, the conviction occurred during the time period stated in the indictment.

The Guidelines define a "prior sentence" for purposes of calculating a defendant's criminal history score as "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1). "When calculating criminal history points, a sentencing court is to consider 'any sentence previously imposed . . . for conduct not part of the instant offense,' defined as conduct other than 'relevant conduct' under U.S.S.G. § 1B1.3." *United States v. Hernandez*, 712 F.3d 407, 409 (8th Cir. 2013) (alteration in original) (quoting *United States v. Pinkin*, 675 F.3d 1088, 1090 (8th Cir. 2012)). This is because relevant conduct is typically considered in calculating the defendant's base offense level. *Id.* We typically defer to the district court's determination on this issue because of its "sentencing expertise and greater familiarity with the factual record." *Id.* (citations omitted).

A prior conviction is not relevant to the instant offense if the conduct underlying the former conviction results in a "severable, distinct offense." *Id.* Factors that we consider in making this determination include "temporal and geographical proximity, common victims, common scheme, charge in the indictment, and whether the prior conviction is used to prove the instant offense." *Id.* (citation omitted). We also consider whether the same sovereign prosecuted the prior conviction. *United States v. Pepper*, 747 F.3d 520, 526 (8th Cir. 2014). As for temporal proximity, we have determined that a difference in two months between the events giving rise to the convictions does not establish relevant conduct. *United States v. Davidson*, 195 F.3d 402, 409 (8th Cir. 1999). Finally, the record must demonstrate a continuity between the two offenses. *Pepper*, 747 F.3d at 526.

The district court did not clearly err. Although the indictment charged six individuals in this heroin conspiracy dating back to 2007, the evidence at trial established that Thomas did not join the conspiracy until August 2009 at the earliest, and the conduct leading to his prior conviction occurred seven months prior. This does not establish temporal proximity. *See Davidson*, 195 F.3d at 409. Furthermore, the conviction occurred in a separate state and was prosecuted by a separate sovereign, so geographic proximity is lacking. *See Pepper*, 747 F.3d at 526; *Hernandez*, 712 F.3d at 409. Importantly, the prior conviction was not used as proof of the heroin conspiracy or otherwise included in the indictment. *See Hernandez*, 712 F.3d at 409. Although Thomas alleges common victims, scheme, and controlled substance, the record does not demonstrate continuity between the two offenses. *See Pepper*, 747 F.3d at 526. Thus, the district court did not clearly err in determining that the prior conviction was separate and distinct from the heroin conspiracy.

It may appear incongruent for us to hold that Thomas's crack distribution is relevant conduct for calculating his offense level and that his prior conviction for cocaine possession is not relevant conduct. However, the district court did not

-19-

consider the *prior conviction* in calculating his offense level, only the criminal history category. In *Hernandez*, we shed some light on any perceived inconsistency:

> When the issue is whether prior conduct should increase the base offense level, it often involves uncharged conduct that will otherwise go unpunished. But when the issue is whether a prior conviction was a "prior sentence" for criminal history purposes, the prior conduct has been punished; the question is the extent of incremental punishment to impose in sentencing the offense of conviction.

*Hernandez*, 712 F.3d at 410. Here, the district court included the evidence of crack distribution in the offense level, which was "uncharged conduct that will otherwise go unpunished." *See id.* This is true despite Thomas's earlier conviction for cocaine possession—conduct not connected to this conspiracy. Consequently, Thomas's conduct has not been double counted in the calculation of his criminal history score and offense level.

### III. *Conclusion*

Based on the foregoing, we affirm the judgment of the district court.

_____