# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1580
_____

United States of America

*Plaintiff - Appellee*

v.

Kelli Suzanne Hogue, formerly known as Kelli Suzanne Cashion

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: January 13, 2023
Filed: May 1, 2023
_____

Before SMITH, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.
_____

SMITH, Chief Judge.

Kelli Suzanne Hogue pleaded guilty to bank fraud, in violation of 18 U.S.C. § 1344(2), and theft of government funds, in violation of 18 U.S.C. § 641. The district court[1] sentenced Hogue to 96 months' imprisonment on each count to run

---

[1]The Honorable Lee P. Rudofsky, United States District Judge for the Eastern District of Arkansas.

concurrently. On appeal, Hogue challenges her sentence, arguing that the district court erred in denying her acceptance of responsibility, erroneously admitted and considered certain tax information, and imposed a substantively unreasonable sentence. We affirm.

I. *Background*

Hogue practiced law in the State of Arkansas as a licensed attorney for five years. Hogue surrendered her law license in May 2001 after she was charged with forgery and possession of counterfeit checks in Pulaski County Circuit Court. Hogue was represented by Paul Herrod of the Herrod Law Firm.

In September 2008, Hogue filed for Social Security disability benefits. In her application, she alleged that she was not able to work due to bipolar disorder, post-traumatic stress disorder, anxiety, and thyroid problems. She stated that she last worked in January 2007. She further claimed that she was unable to go outside, handle her personal finances, care for herself, or hold a conversation with another individual for more than ten minutes due to her disability.

In February 2009, Hogue was awarded Social Security disability. But, unbeknownst to the Social Security Administration (SSA), she began working as a paralegal and law clerk for the Herrod Law Firm. From February 2009 through June 2019, Hogue received approximately $120,523.30 in Social Security disability benefits while gainfully employed.

In March 2009, Hogue opened a bank account for Hogue Outsource Services. Herrod paid Hogue's salary directly to this account until October 2016. At that time, Herrod began writing paychecks to Hogue, paying Hogue $750 to $800 per week until February 2017 when her salary was reduced to $500 per week.

Herrod was the attorney for Runyan Sewer District (RSD), a non-profit company. In September 2010, RSD was seeking a bookkeeper. Herrod recommended Hogue. RSD hired Hogue for $750 per week. Hogue did not disclose her employment to the SSA.

In May 2012, Hogue began embezzling funds from RSD. RSD's checks required two signatures: Hogue's signature and the signature of another individual who traveled often and would provide signed blank checks for Hogue at her request. When Hogue embezzled funds, she would indicate that the checks were written to other entities, such as WW Grainger Co., in the ledger. Hogue would deposit the stolen checks—some valued as much as $15,000—into her account for her personal use.

In fall 2018, a supervisor reviewed account records and discovered numerous checks purportedly written to WW Grainger Co. The supervisor was aware of Hogue previously making purchases at WW Grainger Co. When the supervisor confronted Hogue, she blamed the discrepancy on an error in the record-keeping software. She stated that she would obtain images of the checks from the bank but that the images could take several days to arrive. The supervisor contacted the bank directly and learned that the checks were written directly to Hogue. The supervisor immediately terminated Hogue and contacted the U.S. Secret Service. A subsequent investigation revealed that Hogue issued approximately 180 unauthorized checks made payable to herself from RSD. The checks totaled approximately $669,599.71.

Following her termination, Hogue sent emails to RSD and the Herrod Law Firm. In the emails, Hogue apologized and stated that she would repay the funds if they did not contact law enforcement. Hogue also threatened Herrod with personal embarrassment and ethics violations if he did not make the charges go away. Hogue claimed that she was bipolar and had a gambling addiction.

In February 2019, the government obtained Hogue's income tax returns pursuant to a subpoena. According to these records, in 2018, Hogue filed an individual Arkansas state tax return indicating that she had no income other than the $11,754 that she received in Social Security disability payments. Hogue did not report her income from RSD and the Herrod Law Firm.

On February 12, 2019, Hogue filed a 2018 individual Arkansas state tax return, which stated that her income was $268,480 from Hogue Outsourcing. She attached a fake W-2 to the tax return and sought a $9,099 refund. On March 2, 2019, Hogue filed a second Arkansas state tax return listing her income as $1,441,467; she sought a $16,163 refund. Three days later, Hogue filed a third Arkansas state tax return representing her income as $14,694,870; she sought a $351,745 refund. To substantiate her alleged income, Hogue attached a false W-2 from Hogue Outsourcing. After she filed the return, Hogue contacted the Arkansas Department of Finance regarding her refund and was advised it was rejected as fraudulent. Hogue explained that her high income came from winning the Powerball lottery.

On June 14, 2019, the Office of the Inspector General for the Social Security Administration interviewed Hogue. Hogue reported working for her mother in 2017 and 2018 and earning $300 per month. Hogue stated that forms she had submitted to the SSA in April 2019 were accurate. In the forms, Hogue reported that her depression affected her ability to work and that she was unable to work as an attorney since her condition began. Furthermore, Hogue reported needing special reminders to take showers each day and being terminated from her job over ten years ago. Hogue stated that her conditions affected her ability to complete outside chores, manage money, see, hear, speak, concentrate, remember, understand directions, complete tasks, and get along with others. Hogue claimed that she helped her mother for $100 per month to supplement her income.

Hogue failed to report her firing from the Herrod Law Firm in November 2018. When questioned if she was employed by an attorney, Hogue stated that she previously worked for an attorney in 2008 or 2009. She reported working for the attorney prior to her approval for Social Security disability benefits. Hogue explained that she worked for the attorney for two weeks before she was forced to quit because of her condition. According to Hogue, she would have withdrawn her application for benefits if she were able to continue working for the attorney.

On July 24, 2019, Hogue opened an account in her name at the Bank of the Ozarks. On July 25, 2019, Hogue deposited a $3,500 check from her account at US Bank into her new account at the Bank of the Ozarks; that check was returned for insufficient funds on July 29, 2019. On July 26, 2019, Hogue deposited a $6,500 check from her Arvest Bank account into the Bank of the Ozarks account; that check was returned for insufficient funds on July 31, 2019. During this time period, Hogue gained access to $3,523.99 from her Bank of the Ozarks account when she purchased a $2,949.99 Western Union money order and completed two ATM withdrawals in the amounts of $500 and $100.

In October 2019, Hogue's actions led to an eight-count indictment charging her with six counts of bank fraud, one count of theft of government funds, and one count of false statements to a government agency.

In January 2020, following her indictment, Hogue sent a check to the SSA in the amount of $120,523.30 to repay her benefit overpayment. According to text messages from Hogue, she hoped to pay the restitution in full in exchange for probation.

On August 24, 2021, Hogue pleaded guilty to one count of bank fraud and one count of theft of government funds. Pursuant to a written plea agreement, the government agreed to move for dismissal of the remaining counts against Hogue

-5-

upon acceptance of the guilty plea. The parties stipulated that the amount of loss was $669,599.71 for the bank fraud and $122,047 for the theft of government funds.

In the plea agreement, the parties agreed that Hogue was "eligible for a two-level reduction for acceptance of responsibility unless [Hogue] takes any action between the entry of the guilty plea and imposition of the sentence that is inconsistent with acceptance of responsibility." R. Doc. 36, at 5. They further agreed that the government would make a determination at sentencing if Hogue would be eligible for a three-level reduction for acceptance.

Hogue also "agree[d] to fully and truthfully complete a Financial Statement provided by the United States Probation Office" and "to truthfully complete the financial statement form provided by the [government] . . . , sign it under penalty of perjury, and provide it to the [government]." *Id.* at 9–10. Furthermore, she agreed that, prior to sentencing, she would "notify" the government "before [she] transfers any interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by [her]." *Id.* at 10.

On January 11, 2022, Hogue, through her counsel, sent the following six letters to the government and the probation officer assigned to write the presentence report (PSR): a letter from Hogue, a letter from Hogue's mother, three letters from doctors, and a letter from Hogue's pastor. These letters were to be submitted to the district court at the time of sentencing to argue for leniency. Four of the six letters were falsified by Hogue. The first letter purported to be from W.B. Guthrie, Hogue's pastor. The letter endorsed Hogue as a good person and urged leniency for Hogue. Shortly after receiving the letter, SSA Special Agent Chuck Briscoe, along with an assistant United States attorney, interviewed Guthrie, who stated that he did not write the letter, that the signature on the letter was not his, that the syntax in the letter did not match his, and that he did not know Hogue was "in trouble." R. Doc. 60, at 12.

The second letter purported to be from Dr. Angelo Coppola with Premier Gastroenterology. Secret Service Agent Kavin Gwinn met with Dr. Coppola. After viewing the letter, Dr. Coppola stated that the letter did not come from Premier Gastroenterology, that he had nothing to do with the letter, that the letterhead depicted was not Premier Gastroenterology's letterhead, that the signature on the letter was not his, and that Hogue would no longer be a patient at his office.

The third letter purported to be from Dr. Wesley Lane with the Arkansas Heart Hospital. Agent Gwinn spoke to Dr. Lane's nurse. The nurse reported that the letter was not on their office's letterhead, that their office did not write the letter for Hogue based on their records, and that the signature was not Dr. Lane's.

The fourth letter purported to be from Bowen Hefley Orthopedics. Agent Gwinn spoke to Bowen Hefley Orthopedics's office manager. After reviewing the letter, the office manager denied its legitimacy and stated that it was not on the company's letterhead.

The government moved to revoke Hogue's pre-sentencing release based on Hogue violating the conditions of her release. The government alleged that four of the letters—the three letters from the doctors and letter from the pastor—were fraudulent. At a hearing on the revocation of pre-sentence release, Hogue stipulated to writing the four letters and signing them without the purported authors' permission. The district court revoked Hogue's pretrial release based on her stipulations.

At the sentencing hearing, Hogue's counsel objected to the PSR's removal of two points for acceptance of responsibility. The government then presented the testimony of Special Agent Briscoe. He testified that Hogue submitted financial disclosure statements to the government in December 2021. In the documents, Hogue indicated that she had received a "gift[] valued over $5,000 in the last three years"; specifically, she wrote, "My brother advanced me both our portions of our parents'

estates. I am paying him back by waiving interest in all family assets at mother's death." R. Doc. 61, at 31. Special Agent Briscoe confirmed that, at the time Hogue submitted the financial disclosure statements, "she [had] already paid [RSD] about $669,000 for restitution." *Id.* He also testified that in October 2021, Hogue purchased a Cadillac for approximately $65,000. In the financial disclosure statements, Special Agent Briscoe explained, Hogue listed four bank accounts at the Bank of America, which collectively held $1.4 million. According to Special Agent Briscoe, he and other agents determined that Hogue had received refund checks from the IRS totaling approximately $4 million.

After hearing Special Agent Briscoe's testimony, the court overruled Hogue's objection to the PSR's recommendation to deny acceptance of responsibility. The court identified "two things . . . inconsistent with the acceptance of responsibility" in Hogue's case. *Id.* at 34. First, the court cited the fraudulent letters as inconsistent with acceptance of responsibility. The court explained that such "conduct . . . would have resulted in an enhancement under [U.S.S.G. §] 3C1.1, meaning the obstruction or impeding the administration of justice guideline, absent the plea agreement." *Id.* "Second," the court concluded, "Hogue's false statement about the money from the inheritance that was advanced by her brother is both not true and indicative of continuing false and fraudulent statements that are related enough to the fraud on the government that made them inconsistent with an acceptance of responsibility." *Id.* at 34–35. The court "f[ou]nd by a preponderance of the evidence that Ms. Hogue told . . . the government in a filing that the money that was used for the restitution came from a source that it did not come from; to wit, it came from the advanced funds from her brothers." *Id.* at 35.

The court calculated a Guidelines range of 46 to 57 months' imprisonment. It then asked United States Probation Officer Jessica Powell to testify in order to clarify Hogue's statements to Officer Powell about the source of monies she used to pay restitution. Officer Powell testified that Hogue told her that the funds used to pay

restitution were earned from gambling, that she did not want to tell others about this because she was ashamed about her gambling problem, and that she did not want her family to know.

In arguing for a 57-month sentence, the government again called Special Agent Briscoe to testify about Hogue's tax returns. Hogue's counsel "objected to the monthly tax returns" and requested a continuance to have time to review them. *Id.* at 62. Hogue's counsel noted that he had just received the tax forms that morning despite having requested them three weeks prior. He represented that he could not obtain the tax filings from his client because she was in jail. The court overruled the objection.

Special Agent Briscoe testified about Hogue's tax filings and refund checks after reviewing the following exhibits: (1) a 2018 U.S. individual income tax return for Hogue showing wages for 2018 in the amount of $268,480; (2) a copy of Hogue's Arvest bank account showing a tax refund check in the amount of $48,646 dated April 17, 2019; (3) a copy of a U.S. Treasury check to Hogue for a tax refund in the amount of $42,691.88, dated June 7, 2021; (4) a copy of a U.S. Treasury check to Hogue in the amount of $1,522,503.29, dated September 20, 2019; (5) a 2020 U.S. individual income tax return for Hogue showing income of $7,589,032 in 2020 and a refund amount of $2,413,618; (6) a copy of a U.S. Treasury check to Hogue in the amount of $2,370,322.77, dated October 8, 2021, for the 2020 tax refund; and (7) a spreadsheet of financials derived from bank accounts under Hogue's control showing a tax refund in December 2021 in the amount of $5,755 for her 2010 tax return. Hogue's counsel made a standing objection to admission of these exhibits.

Special Agent Briscoe confirmed that the total amount of the five tax refunds was approximately $3,989,918.70. He testified that "these tax returns were fraudulently filed" based on undisputedly false representations made by Hogue about the identity of the tax filer, her disability status, and employment status. *Id.* at 70.

Based on Special Agent Briscoe's testimony, the court "f[ou]nd by a preponderance of the evidence that Ms. Hogue fraudulently filed tax returns from 2018 to 2021 and fraudulently sought false refunds." *Id.* at 71–72. The court found the evidence "relevant to the [18 U.S.C. §] 3553 factors overall." *Id.* at 72.

The court then imposed a 96-month sentence, an upward variance from the Guidelines range. In explaining its sentence, the court made clear that it had "consider[ed] all of the factors that Congress has set out . . . in the sentencing statute," even if it did not expressly discuss them. *Id.* at 81. The court explained that it had read all of the letters submitted on Hogue's behalf and listened to all the evidence and the parties' arguments. "As it relates to the nature of the offense," the court commented that Hogue's conduct was "some of the worst conduct [the court] ha[d] ever seen." *Id.* at 82. The court characterized Hogue's conduct as "brazen," taking "place over a significant time period" during which Hogue held "a significant position of trust and violated that trust." *Id.* The court characterized Hogue's "offense conduct as much worse than the everyday drug dealer that comes in here or the everyday felon in possession that comes in here." *Id.* It concluded that "the nature of [Hogue's] offense" "call[ed] out for a top-of-the-range, if not higher, sentence." *Id.*

The court also noted Hogue's substantial criminal history. The court was concerned that Hogue's conduct was "escalating in the sense of [becoming] more brazen and more serious thefts and fraud." *Id.* The court noted Hogue's lack of respect for the law and the unusual level of law-breaking she displayed.

The court acknowledged that Hogue had "some mental issues" but concluded that those issues did not preclude her from conforming her behavior to reasonable societal expectations. *Id.* at 84. The court found her to lack credibility and that her mental diagnoses likely reflect "some malingering." *Id.* at 85. The court told Hogue, "I don't trust you. I don't believe anything you say. I don't believe anything that's

come out of your mouth. That tends to happen when you submit fraudulent letters to a court, so I am not going to give you a discount on that front." *Id.*

## II. *Discussion*

On appeal, Hogue argues that the district court erred in denying her acceptance of responsibility, erroneously admitted and considered certain tax information, and imposed a substantively unreasonable sentence.

### A. *Acceptance of Responsibility*

Hogue argues that the district court erred in denying her a two-level reduction for acceptance of responsibility based on the fraudulent letters and her failure to be truthful about the source of the funds that she used to pay her restitution. She maintains that "[n]one of that has anything to do with whether she accepted responsibility for commission of the offenses" to which she pleaded guilty. Appellant's Br. at 21.

Section 3E1.1(a) of the Guidelines provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." "[W]e will not disturb a district court's decision to deny or grant the reduction [for acceptance of responsibility] unless that decision is clearly erroneous." *United States v. Gonzalez*, 781 F.3d 422, 431 (8th Cir. 2015) (internal quotation marks omitted). This is because the "district court is in a unique position to evaluate acceptance of responsibility." *Id.* (internal quotation marks omitted). Thus, we will "reverse only if the court's denial is so clearly erroneous as to be without foundation." *Id.* (internal quotation marks omitted).

Although a defendant's guilty plea prior to the trial's commencement, the defendant's truthful admission of offense conduct, and truthful admission of other relevant conduct "will constitute significant evidence of acceptance of responsibility," such "evidence may be outweighed by conduct of the defendant that

is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.3. Thus, entry of a guilty plea does not entitle a defendant to the adjustment "as a matter of right." *Id.*

Here, the district court based its denial of acceptance of responsibility on the letters that Hogue stipulated to falsifying and the materially false information that she provided to a probation officer. The district court found Hogue's conduct inconsistent with the acceptance of responsibility and constituting conduct that *would have* resulted in an enhancement under § 3C1.1 for obstruction of justice. We hold that Hogue's fraudulent conduct was a sufficient basis on which to deny Hogue a reduction for acceptance of responsibility.

The district court's factual findings are supported by the record. First, Hogue stipulated to sending falsified letters in support of herself to the probation officer and the government. Specifically, Hogue stipulated to writing one letter purportedly from her pastor and three letters purportedly from medical providers and signing each letter without their authorization or knowledge. Fraudulent conduct is inconsistent with accepting responsibility for bank fraud.

Second, the evidence at sentencing showed that Hogue lied to the probation officer about the source of the funds that she used to pay restitution. Special Agent Briscoe testified that Hogue submitted financial disclosures to the government representing that she received the funds in question when her brothers advanced to her inheritance funds from their parents' estates and that she waived interest in all family assets at her mother's death. Probation Officer Jessica Powell testified that Hogue stated that the funds she used to pay restitution were earned from gambling. Based on this evidence, the district court did not clearly err in finding that Hogue's false statements about the purported inheritance money advanced by her brothers were "indicative of continuing false and fraudulent statements that are related enough

-12-

to the fraud on the government [to] make them inconsistent with an acceptance of responsibility." R. Doc. 61, at 34–35.[2]

### B. *Admission of Tax Information*

Hogue next argues that the district court erred in admitting her 2018, 2019, and 2020 tax information and relying on it in sentencing her. According to Hogue, "[a]nything [she] did in connection with income tax returns and refunds had nothing to do with the offenses charged in the indictment in this case nor the two offenses to which she pled guilty." Appellant's Br. at 24.

"Federal courts historically have exercised . . . broad discretion to consider all relevant information at an initial sentencing hearing, consistent with their responsibility to sentence the whole person before them." *Concepcion v. United States*, 142 S. Ct. 2389, 2398 (2022). "At an initial sentencing, Congress has provided generally that '[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense' when deciding what sentence to impose." *Id.* at 2400 (alteration in original) (quoting 18 U.S.C. § 3661). As a result, a district court "may consider any relevant information that may assist the court in determining a fair and just sentence." *United States v. Gant*, 663 F.3d 1023, 1029 (8th Cir. 2011). "In sentencing, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Id.* (cleaned

---

[2]Hogue suggests that the district court "[a]lso considered . . . information introduced, over her objection, about her 2018, 2019 and 2020 tax returns, all of which had been filed long before she accepted responsibility for the offenses upon which she was indicted." Appellant's Br. at 18. But the district court made clear at sentencing that its decision to deny a two-level reduction was based on the fraudulent letters and on Hogue's false statement to the government concerning money from an inheritance.

up). The information that the district court considers "must have a sufficient indicia of reliability to support its probable accuracy. A court may consider relevant information that includes criminal activity for which the defendant has not been prosecuted and uncorroborated hearsay, provided the defendant is given a chance to rebut or explain it." *Id.* at 1029–30 (cleaned up).

A "district court may sentence a defendant based upon judge-found facts and uncharged relevant conduct so long as the district court does not impose a sentence above the statutory maximum for the crime of conviction." *United States v. Thomas*, 760 F.3d 879, 889 (8th Cir. 2014). A district court's factual findings must be supported by a preponderance of the evidence. *Id.* "The district court may consider charged, uncharged, dismissed, and acquitted conduct as relevant conduct." *Id.* "Relevant conduct includes all acts and omissions of the defendant that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* at 888 (internal quotation marks omitted). "[I]n determining whether actions constitute relevant conduct," we consider "the similarity, regularity, and temporal proximity of the charged and uncharged conduct." *Id.* (internal quotation marks omitted). We have stressed that "[t]his is a factually intensive inquiry that is best left for district courts." *Id.* We review for clear error a district court's relevant-conduct findings. *United States v. Adams*, 451 F.3d 471, 473 (8th Cir. 2006).

Having reviewed the record, we hold that the district court did not err in admitting and considering Hogue's 2018, 2019, and 2020 tax filings. Special Agent Briscoe testified about the tax returns and W-2 forms that Hogue filed, as well as the tax refunds she received in 2018, 2019, and 2020. He further testified that Hogue received a treasury check for a 2020 tax refund in the amount of $2,370,322.77 on October 8, 2021; Hogue received this treasury check approximately six weeks *after* pleading guilty. Based on Special Agent Briscoe's testimony, the district court found by a preponderance of the evidence that Hogue filed fraudulent tax returns to obtain false refunds. This finding was not clearly erroneous.

-14-

The court found this tax information relevant to the § 3553 factors. We agree. As the government points out:

> The falsification and filing of fraudulent tax returns involves dishonesty to obtain monies and is similar to the offenses to which Hogue pleaded guilty—writing unauthorized checks to herself in a scheme to defraud and take money from RSD and lying to obtain government monies by receiving Social Security disability payments by falsely claiming she was unable to work when she was in fact working.

Appellee's Br. at 30. Hogue's conduct "is relevant as a continuation of the dishonest conduct that formed the basis of her conviction for theft of government funds and bank fraud." *Id.* at 31. Additionally, the conduct was relevant given Hogue's contention that "she had no income other than SSA disability payments when in fact she was receiving income from RSD and Herrod Law Firm." *Id.* at 32.

## C. *Substantive Reasonableness*

Finally, Hogue challenges her 96-month sentence as substantively unreasonable, arguing that her sentence "represents an extraordinary upward variance" even though "[t]here were no extraordinary circumstances." Appellant's Br. at 34.

"[W]e . . . consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. In conducting this review, we are to take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (cleaned up). Although we "may consider the extent of the deviation" in conducting our review, we "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.* at 461–62 (internal quotation marks omitted). "[A] district judge who favors a tough sentence is entitled to the same degree of deference as a district judge who opts for

-15-

a lesser punishment." *United States v. Deegan*, 605 F.3d 625, 634 (8th Cir. 2010). Additionally, "the district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence, and a defendant's disagreement with the district court's balancing of relevant considerations does not show that the court abused its discretion." *United States v. Campbell*, 986 F.3d 782, 800 (8th Cir. 2021) (cleaned up).

Given this record, we hold that Hogue's 96-month sentence is substantively reasonable. The district court stated that it had considered all of the § 3553(a) factors and offered a lengthy explanation for why it was imposing an upward variance under those factors. It characterized Hogue's offense conduct as "brazen," "some of the worst conduct [the court] ha[d] ever seen," and a breach of trust. R. Doc. 61, at 82. It characterized Hogue's criminal history as extensive and "escalating." *Id.* "In terms of promoting respect for the law," the court noted that Hogue—previously a lawyer—displayed "so much contempt for the law" and an "active interest in avoiding the law and an active desire to violate the law over and over again." *Id.* at 83. To specifically deter Hogue from committing this type of conduct again, the court wanted to "send a message" to Hogue with a "stiff sentence." *Id.* at 84. Based on the evidence of record, the district court was within its discretion to give these factors greater weight than Hogue's asserted mitigating factor of her mental health. *See Campbell*, 986 F.3d at 800.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

-16-